Jordan L. Lurie (SBN 130013)
Ari Y. Basser (SBN 272618)
POMERANTZ LLP
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 432-8492
jllurie@pomlaw.com
abasser@pomlaw.com
*Counsel for Lead Plaintiff Fadel Sakkal*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| FADEL SAKKAL, individually and on behalf of all others similarly situated, | Case No. 3:20-cv-05959-RS |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| ANAPLAN INC., FRANK CALDERONI, and DAVID H. MORTON, | **JURY TRIAL DEMANDED** |
| Defendants. | The Honorable Richard Seeborg |

1    Lead Plaintiff Fadel Sakkal ("Plaintiff"), individually and on behalf of all other persons

2  similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the

3  following based upon personal knowledge as to himself and his own acts, and information and belief

4  as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys,

5  which included, among other things, a review of Defendants' public documents; conference calls and

6  announcements made by Defendants; United States Securities and Exchange Commission ("SEC")

7  filings; wire and press releases published by and regarding Anaplan Inc. ("Anaplan" or the

8  "Company"); analysts' reports and advisories about the Company; information obtained from

9  interviews with knowledgeable individuals; and information readily obtainable on the Internet.

10  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after

11  a reasonable opportunity for discovery.

12                              **NATURE OF THE ACTION**

13    1.    This is a federal securities class action on behalf of a class consisting of all persons

14  other than Defendants who purchased or otherwise acquired Anaplan securities between November

15  21, 2019 and February 26, 2020, both dates inclusive (the "Class Period"), arising out of materially

16  false and misleading statements that Anaplan, its Chief Executive Officer Frank Calderoni

17  ("Calderoni"), and its Chief Financial Officer David Morton ("Morton") (collectively, "Defendants")

18  made to investors in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

19  "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a); and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R.

20  §240.10b-5, regarding Defendants' omissions of then-known negative material information regarding

21  the Company's sales process, which undermined Defendants' positive statements about Anaplan's

22  sales department and its present ability to continue its growth trajectory.

23    2.    Anaplan is a software-as-a-service ("SaaS") company that provides business-planning

24  and decision-making software to organizations.  Anaplan touts its "pioneer[ing] . . . of Connected

25  Planning," which it claims will "fundamentally transform[] planning by connecting all of the people,

26  data, and plans needed to accelerate business value and enable real-time planning and decision-making

27  in rapidly changing business environments."  The Company completed its initial public offering

28

("IPO") on October 12, 2018 at $17 per share, and appreciated to $49.15 per share just before the Class Period.

3.      Unlike traditional software companies that license software outright for large, one-time fees, SaaS companies like Anaplan sell subscriptions allowing customers to access their software over a period of time, creating a stream of recurring revenues.  Under Generally Accepted Accounting Practices, reported "revenue" captured only the fraction of that stream that could be recognized ratably within the reporting period.  To better assess the actual business generated within a given period, investors and analysts focused on the growth of Anaplan's "billings": the sum of its periodic revenue and the change in its deferred revenue.[1]  Investors and analysts evaluated Anaplan's billing growth on a year-over-year basis—comparing, for example, the fourth quarter of 2018 with the fourth quarter of 2019.

4.      Just prior to the Class Period, analysts praised Anaplan's extraordinary billings acceleration, noting that it was "further validation of strong sales trends."  Even still, Anaplan's billings acceleration for the fiscal third quarter of 2020, announced during Defendants' earnings conference call at the beginning of the Class Period on November 21, 2019, eclipsed the market's high expectations.  During that conference call, Anaplan and Morton proclaimed that Anaplan's "calculated billings" had grown 59% year-over-year, even higher than the 46% year-over-year billings growth rate for the fiscal second quarter.  Morton confirmed that Anaplan's billings would "track in line with overall revenue growth rates," then growing 44% year-over-year.

5.      When an analyst asked Calderoni to comment on any "macro concerns" that he saw in the quarter or in the guidance Anaplan provided, Calderoni pointedly stated, ***"we're not seeing any changes in the macro environment or within deal cycles or anything like that."***  Similarly, when asked to comment on Anaplan's "deferred patterns," Morton reassured investors that Anaplan "would continue on at the rate and pace as we guide our performance this year within the lines of the

---

[1] At times, Anaplan used different terms for its "billings" metric.  When speaking to investors and analysts, it frequently used the term "calculated billings."  In SEC filings, it used the term "estimated billings."  Each referenced the same calculation.

preliminary guidance we gave for next fiscal year." Calderoni lauded Anaplan's "impressive leaders and innovative talent," and stated that "we have a lot more momentum ahead of us."

6.     Anaplan's investors and analysts reacted positively to the news, sending Anaplan's share price up over 8% to close at $53.09 per share. SunTrust Robinson Humphrey "raised their billings estimates across the board." RBC Capital Markets likewise emphasized that Anaplan's "[g]uidance was raised by more than the beat for FY20, and preliminary guidance for FY21 was ahead of expectations."

7.     Defendants continued to feed the strong sales narrative over the ensuing weeks. In the quarterly report that Anaplan filed on Form 10-Q for the fiscal third quarter of 2020, on December 9, 2019, Defendants reassured investors that Anaplan "ha[d] invested and intend[ed] to continue to invest aggressively in expanding [its] direct sales force, particularly in attracting and retaining sales personnel with experience selling to larger enterprises."

8.     On December 11, 2019, Morton spoke at the Barclays Global Technology, Media, and Telecommunications Conference. In response to a question from the moderator characterizing Anaplan's billings growth acceleration as "pretty unique" unlike the post-IPO deceleration noted for many SaaS peers, Morton explained that Anaplan's growth thesis was "pretty straightforward" and that Anaplan's "framework" was dependent on "the executives around the table that [Calderoni] has been able to hire."

9.     Two days later, on December 13, 2019, Jim Cramer of CNBC's *Mad Money* asked Calderoni in a televised interview, "Frank, how does someone go from 46% to 59% acceleration?" Calderoni explained that "what's really driving our growth" was "the space we're in . . . [because] the whole digitization is really starting to accelerate. . . . we've got a great platform that we can offer great value in a reasonable amount of time for companies to implement Anaplan and then also accelerate."

10.    But Anaplan, Morton and Calderoni omitted from their public statements to investors then-known material adverse information about the Company's deal pipeline, deterioration in the sales force, and turnover among Anaplan's sales executives and other leaders that imperiled their claimed "momentum". Each knew about this disarray at the time of their public statements, because Calderoni and Morton were at the center of the problem. Calderoni and Morton exerted extreme pressure on

Anaplan's sales and marketing teams, and had recently driven out its top global sales executive. Multiple confidential witnesses ("CWs") confirmed that Calderoni and Morton devolved sales meetings into heated arguments full of yelling and cursing.  Calderoni routinely criticized and overruled the Company's sales leadership, leaving the sales force in a state of disarray.  *See* ¶¶36-37, 46-50, *infra.*

11.     High turnover was such a problem for Anaplan's sales force that internally the process had a name: "hire fast and fire faster."  Defendants knew at the time of the Class Period that the turnover problem was not limited to account representatives, but extended to sales leadership.  At least six sales and marketing executives had left Anaplan in the preceding year. This included Paul Melchiorre, Anaplan's Global Customer Officer, and Anaplan's former Chief Revenue Officer, who turned away many millions of dollars in stock options to get away from the toxic climate at Anaplan.

12.     Calderoni and Morton imposed incredibly aggressive sales quotas without regard to whether such sales were possible.  Specifically, sales representatives at Anaplan were pressured to mark potential sales as "commits"—which was supposed to mean at least an 80-90% chance of closing during the quarter—even when they were expected to close in later quarters, if at all.  As a result, only 10% to 20% of Anaplan's sales force regularly hit their sales targets.  Defendants were aware of the slump in Anaplan's billings growth at the time of their public statements due to their receipt of real-time pipeline updates from the Company's sales-forecasting software.  *See* ¶¶26-27, 43-44, 83.

13.     Anaplan disclosed its flagging sales momentum on February 27, 2020.  During an earnings call regarding its results for the fiscal fourth quarter of 2020, Morton admitted that billings growth had slipped to 25%, which was a major departure from its revenue growth rate, well below the market's consensus, and a significant deceleration from the prior quarter.  Defendants blamed the lackluster growth rate on "management changes" that "affected alignment around some key near-term opportunities . . . resulting in a lower-than-anticipated growth in billings," and warned that there would be additional turnover in its sales-management ranks, as recently-hired Mark Anderson "ha[d] decided to step back from his full-time role to spend more time with family."  Investors and analysts viewed Anderson's departure as a reflection of the problems within Anaplan's sales department, especially because he had just been hired the prior August.

14.     In reaction to this disclosure, the price of Anaplan's common stock plunged 24.2%, from its closing price of $58.09 on the previous day, to close at $44.03 on February 27, 2020, on record-setting trading volume that exceeded the volume on the day of its IPO by over 125%.



15.     As a result of Defendants' wrongful acts and omissions, the resulting precipitous decline in the market value of Anaplan's securities wiped out more than a billion dollars of market capitalization and caused Plaintiff and other members of the Class to suffer significant damages.

**JURISDICTION AND VENUE**

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or

the effects of the fraud have occurred in this District.  Many of the acts charged herein, and the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this District at 50 Hawthorne Street, San Francisco, California.   Moreover, both Calderoni and Morton state on their LinkedIn profiles that they are located within this District, in San Francisco and the San Francisco Bay Area, respectively.

19.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

20.     Plaintiff purchased Anaplan securities during the Class Period, as described in his Certification previously filed with this Court, *see* ECF No. 22-3, and suffered damages as a result of Defendants' violations of federal securities laws alleged herein.

21.     Defendant Anaplan Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  At all times relevant hereto, Anaplan was a provider of business-planning and decision-making software-as-a-service and traded on the NYSE under the ticker "PLAN."

22.     Defendant Frank Calderoni is, and at all relevant times was, the CEO and Chairman of Anaplan's Board of Directors.  Calderoni participated on Anaplan's conference calls, was identified as a source of information in its press releases, and himself made materially false misrepresentations and omissions to the market as identified herein.  Calderoni had the authority and ability to control the false or misleading statements made by Anaplan and Morton.

23.     Defendant David H. Morton is, and at all relevant times was, the Executive Vice President and CFO of Anaplan.  Morton participated on Anaplan's conference calls, was identified as a source of information in its press releases, and himself made materially false misrepresentations and omissions to the market as identified herein.  Morton had the authority and ability to control the false or misleading statements made by Anaplan and other Anaplan executives.

**SUBSTANTIVE ALLEGATIONS**

**I.      Background**

24.     Anaplan provides a cloud-based planning platform to integrate planning functions across an organization.  According to the Company's Form 10-K for fiscal 2020, filed with the SEC on March 29, 2019 (the "Fiscal 2020 10-K"), Anaplan "pioneer[s] the category of Connected Planning, which allows organizations to transform their businesses by making better and faster decisions." "Connected Planning," claims the Company, "is the next essential cloud category," which "fundamentally transforms planning by connecting all of the people, data, and plans needed to accelerate business value and enable real-time planning and decision-making in rapidly changing business environments." *Id.*

25.     According to its Fiscal 2020 10-K, Anaplan's platform "enable[s] real-time planning and decision-making in rapidly changing business environments" and "plac[es] the power of planning in the hands of every individual at every level within and between organizations."  Indeed, on the front page of its website, Anaplan lists use-cases for "Planning, Budgeting & Forecasting"; "Sales Planning"; "Sales Incentives"; "Sales Insights"; "Demand Planning"; and "Sales & Operations Planning."

26.     As the Company touts in its "Sales Forecasting Software" use-case, "Anaplan for Sales Forecasting gives sales leaders the ability to deliver forecasts that are reliable and dynamic, empowering them to make updates on the fly based on current market conditions."  Anaplan Inc., *Sales Forecasting Software*, *available at*: https://www.anaplan.com/use-case/sales-forecasting-software/ (last visited Jan. 6, 2021).  The use-case continues that Anaplan's platform can:

> Analyze sales forecasts by geography, product line, or account with the ability to drill down to any level of granularity—e.g., by city or state, specific product SKU, or a vertical-specific set of accounts. Gain a better handle on pipeline health and use Predictive Insights to help focus sales resources on the best opportunities to drive more consistent revenue.

> **Connect forecasts with sales planning and performance**

> Align real-time sales forecasts with sales planning models and metrics. Calculate quota attainment and estimated compensation payouts, make adjustments to sales capacity, optimize territories, and make quota relief considerations based on data-driven projections and market conditions.

**Enable forecasting at an enterprise scale**

Ensure that the entire organization is making revenue projections and sales forecasts using a standard methodology. Give everyone in the business a clear view of revenue health and empower them to quickly perform complex analysis across many dimensions.

**Inform better decisions across the organization**

Provide accurate, up-to-date sales forecasts to leaders across the organization, enabling all business units and departments, including sales, finance, HR, and marketing, to make better, more informed decisions.

**Get data-driven sales benchmarking and trend analysis**

Generate sales forecast benchmarks from historical sales performance and third-party-sourced intent data. Analyze patterns using time-based dashboards and key performance indicators (KPIs), such as velocity calculations, trend-based analytics, and seasonal fluctuations.

*Id.*

27.    The sales-forecasting use-case also includes a table captioned "Key challenges and how Anaplan solves them", which is reproduced as follows:

| **Common challenges** | **Anaplan capabilities** |
|---|---|
| Delays in forecasting due to manual and siloed processes, such as spreadsheet aggregation and sales data analysis | Enable accurate, real-time forecast creation in one place while automatically surfacing actionable insights to improve sales productivity |
| Inaccurate sales forecasts due to overreliance on seller intuition and historical data that does not reflect the current market landscape | Leverage third-party data as well as historical sales patterns, including trend and seasonality, to create more accurate forecasts that represent the present selling environment |
| Few insights to guide sales activities due to limited visibility into pipeline health | Provide actionable intelligence with Predictive Insights to more effectively optimize pipeline and shore up sales forecast strength |
| Inefficient and non-secure collaboration using spreadsheets sent via email | Easily and securely collaborate on top-down or bottom-up forecasts across functional areas in real time |

*Id.*

28.    Anaplan "sell[s] our cloud platform primarily through our direct sales team."  *See* Fiscal 2020 10-K.  According to the Company, Anaplan "delivers its application over the Internet as

a subscription service using a SaaS model." *See* Anaplan's Fiscal 2020 10-K.  SaaS companies cannot be accurately analyzed solely using traditional accounting measures.  Attempting to judge a SaaS company "based on revenue and earnings per share." can "lead to bad investment decisions."  Scott Kupor & Preethi Kasireddy, *Understanding SaaS: Why the Pundits Have it Wrong*, Andreessen Horowitz, *available at*: https://a16z.com/2014/05/13/understanding-saas-valuation-primer/ (May 13, 2014) ("*Understanding SaaS*").

29.     There are two reasons why.  First, generally-accepted accounting principles require Anaplan and other SaaS companies to recognize service revenue "ratably"—that is, as the Company delivers its service to its customers.  According to the Company's Form 10-Q for their fiscal second quarter 2020 10-Q, filed with the SEC on September 9, 2019 (the "Fiscal Second Quarter 2020 10-Q"), "[r]evenue is recognized when a customer obtains access to the platform and receives the related professional services.  The amount of revenue recognized reflects the consideration that the Company expects to be entitled to receive in exchange for these services."

30.     Second, in contrast to its revenue, which is recognized over time, a SaaS company like Anaplan:

> incur[s] almost *all* its costs to be able to acquire that customer in the first place – sales and marketing, developing and maintaining the software, hosting infrastructure – up front.  Many of these up-front expenses don't get recognized over time in the income statement and therein lies the rub: The timing of revenue and expenses [is] misaligned."

*Understanding SaaS*.  It follows that "in a young SaaS business, growth exacerbates cash flow – the faster it grows, the more up-front sales expense it incurs without the corresponding incoming cash from customer subscription fees.  *Id.*  As a result, "[m]any SaaS companies believe, due to the high-growth nature of the tech industry, that using revenue for valuations does not capture the true state of the company. Rather, SaaS companies want to use the current value of all recurring contracts to more closely approximate value."  Justin Holstead et al., *Tech Valuations (SaaS)*, IPOHub, *available at*: https://www.ipohub.org/tech-valuations-saas/ (Feb. 18, 2020).

31.     The most frequent measure of a SaaS company's recurring contract revenues is "billings," or as Anaplan called it, "calculated billings".  According to Andreessen Horowitz:

> A good proxy to measure the growth – and ultimately the health – of a SaaS company

is to look at Billings, which is calculated by taking the revenue in one quarter and adding the change in deferred revenue from the prior quarter to the current quarter.  If a SaaS company is growing its bookings – whether through new business or upsells/renewals to existing customers – billings will increase.

*Understanding SaaS*.  Billings growth better captures a SaaS company's prospects than recurring changes in revenue because "a SaaS company could show stable revenue for a long time (just by working off its billings backlog) which could make the business seem healthier than it truly is."  *Id.*

32.     Analysts consistently identified the growth of Anaplan's calculated billings as a key performance indicator.  For example, KeyBanc analyst Brent Bracelin wrote that Anaplan's three straight quarters of calculated billings growth "have alleviated initial sales execution concerns that the Company faced at the time of the IPO."  *See* Ryan Vlastelica, *Anaplan Upgraded as KeyBanc Has Confidence in Revenue Potential*, Bloomberg (June 6, 2019).  Right before the Class Period, Morgan Stanley acknowledged that "[e]xpectations 'remain[ed] elevated into the Q3 print, with expectations for another sizeable billings beat and raise to FY20 revenue guidance.'"  *See* Ryan Vlastelica, *Preview Anaplan 3Q: Billings Growth Key*, Bloomberg (Nov. 20, 2019).  Needham observed that "[m]id-40%s subscription growth will be viewed as 'further validation of strong sales trends."  Scott Berg, *Q3 Preview Highlights Underpenetrated TAM*, Needham & Co., LLC (Nov. 19, 2019).  Rosenblatt Securities was even rosier, praising Anaplan's billings as "indicat[ive] [of] continued positive business outcome" and noted that Anaplan "can continue to grow its billings in the 40%+ range for the rest of the year." Yun Kim, *PLAN: Checks Indicate Steady Business Trends*, Rosenblatt Securities Inc. (Nov. 17, 2019).

33.     Anaplan confirmed in its periodic SEC filings, including its Fiscal Second Quarter 2020 10-Q, that revenue and deferred revenue—the components of its "calculated billings" metric—were "key metrics."   The Company presented, and analysts and investors examined, the growth of Anaplan's billings on a year-over-year basis (*e.g.*, comparing fourth quarter 2018 to fourth quarter 2019), instead of quarter-over-quarter.

34.     Anaplan, moreover, tracked several related metrics that were based on individual invoices and contracts, including "bookings," "billings," and "backlog."  CW1 was Chief Revenue Officer at Anaplan from February 2018 to April 2019 and reported to Calderoni.  CW1 explained that

a "booking" is valued as the entire value of the contract; "billings," when used in the context of an individual contract, refers to the total revenue the Company expects to recognize over the coming year from that contract (in other words, the sum of the amount recognized in the quarter as revenue and the deferred revenue to be recognized over the proceeding three quarters), which is the amount invoiced; and "backlog" refers to revenue that Anaplan expects to receive in the future from the contract, but that has not been invoiced.  As an example, CW1 explained that given a three-year, $3 million deal invoiced at the beginning of the year, the "booking" would be $3 million, the "billing" would be $1 million, the "backlog" would be $2 million, the quarterly revenue would be $250,000, and the deferred revenue would be $750,000.  CW2, Vice President of Financial Planning and Analysis at Anaplan from September 2017 to June 2019, confirmed through a similar example that billings were calculated in this manner.[2]

35.     CW3 was a Senior Revenue Accountant at Anaplan from May 2019 to September 2020. CW3 reported to Senior Revenue Manager Victor Win, and worked on compiling calculated billings for the Company.  CW3 was personally involved in preparing two different reports related to calculated billings that were presented to Morton at Anaplan's monthly CFO meeting: the "BBB" report reported numbers for bookings, billings, and backlogs.  The billings analysis report, meanwhile, included all the invoices for the current month; compared month-over-month billings amounts; assessed calculated billings; and accounted for any variances.  Both in this way and through the billings-forecast abilities of Anaplan's platform, Defendants were aware of Anaplan's billings, actual revenue, and changes in its deferred revenue on a monthly, quarterly, and annual basis throughout the Class Period.

## II.     Known But Undisclosed Problems Threatened Anaplan's Sales Momentum

### A.     Calderoni and Morton exert extreme pressure on Anaplan's sales teams

36.     Heated clashes between Calderoni and Morton on the one hand, and Anaplan's sales team on the other, were well-known at the Company.  According to CW1, Calderoni's meetings with

---

[2] CW2 reported initially reported to CFO Anup Singh, who left Anaplan in July 2018.  CW2 then reported to Calderoni, as interim CFO, until Morton was appointed in September 2018, and thereafter to Morton.

1  sales leadership had devolved into a combative environment on steroids, and CW1 described

2  Calderoni's veins popping out of his neck while he screamed expletives at Anaplan's executives and

3  banged the table.  CW1 further explained that Calderoni hovered over the sales department and

4  questioned its leadership, micromanaging the day-to-day operations.  CW4, Anaplan's former Vice

5  President of Corporate Marketing from November 2019 to June 2020, corroborated CW1's

6  observation regarding Calderoni's micromanagement and distrust of decisions made by the sales

7  leadership. CW4 further recalled that as abrasive as Calderoni was, Morton was even worse.  CW1

8  stated that the harsh environment created by Calderoni and Morton was so bad that CW1 left behind

9  many millions of dollars in stock options just to get away from them.

10       37.    CW4 reported that even after Anaplan's sales leadership team adopted a sales plan,

11  Calderoni would overrule them and change the plan every few days.  CW4 reported that Calderoni's

12  erratic changes adversely affected Anaplan's sales team, creating an environment of chaos and

13  paralysis.  CW4 noted the in-Company joke that the people underneath the executive leadership team

14  were actually running the Company while Calderoni and Morton floundered.  Just prior to CW4's

15  hiring in November 2019, Calderoni acknowledged Anaplan's "big morale problem" during CW4's

16  job interview and asked CW4 to fix it.  Only after CW4 started at Anaplan, however, did CW4 realize

17  that Calderoni was not really trying to solve the Company's morale problem—he was the problem.

18       38.    These problems were exacerbated by Anaplan's use of unachievable sales quotas.

19  According to CW5, who was one of Anaplan's Regional Vice President of Sales from September 2019

20  to April 2020; CW6, one of Anaplan's Enterprise Account Executives from March 2018 to December

21  2019; and CW7, one of Anaplan's Strategic Account Executives from August 2018 to November

22  2019, only a small fraction of Anaplan's sales team, between 10% and 20%, met the unrealistic quotas.

23  By contrast, CW7 explained, in CW7's previous employment with Salesforce.com, at least 50% of the

24  sales team met their annual quotas.

25       39.    CW7 explained that sales departments at most companies have "stages" that reflect

26  when potential deals are hitting specific benchmarks as they move through the pipeline toward

27  closing.  At Anaplan, these stages were supposed to reflect the probability that a deal would close

28  within the given timeframe.  For example, a potential deal with a 30% chance of closing would be

stage 2, 50% would be stage 4, and 70% would be stage 5.  CW8, who worked as a Strategic Account Executive at Anaplan from early 2018 to early 2019, added that in order to be listed as a "commit," a deal needed to be 80-90% likely to close in the given timeframe.

40.    CW7 reported that sales managers at Anaplan analyzed the sales pipeline within Anaplan's customer relationship management ("CRM") software, Salesforce.com.  CW7 recalled that CW7's sales manager, Deb Kennedy ("Kennedy"), explained to CW7 that she was able to change what the salespeople forecast when entering it into the forecasting model.  As an example, CW7 said that when a salesperson would classify the deal at stage three, the sales manager would inflate the deal's progress to stage five in the Company's billings projection. CW7 added that even when the salesperson only assigned a 50% chance that the deal would close, his or her sales manager would forecast the deal to close by the end of the quarter.  CW7 observed Kennedy altering the forecast to inflate closing expectations much more frequently than altering the forecast to moderate closing expectations.

41.    CW6 recalled CW6's manager, Mark Donsky ("Donsky") would regularly sit down with his sales team and compare their overall pipeline with the Company's quotas.  Donsky told his team that their jobs depended on showing a good pipeline of deals, and that "people who don't have pipeline don't have jobs."  If the sales team had less than the quota in the pipe, CW6 reported that Donsky would say things to indicate that the pipeline needed to show better numbers, such as characterizing a potential deal as a committed sale, or a "commit."  CW8 explained that before considering a deal a "commit," the salesperson was supposed to be convinced that the customer wants to get the deal done and that the deal can realistically be closed in the given time frame.  CW8 agreed with CW6 that because there were not enough deals in the pipeline, CW8 and other salespeople were pressured to commit a higher percentage of what was in the pipeline.  When CW8 objected that CW8 was uncomfortable labeling a potential deal as a "commit," CW8 was told "you don't think it's going to happen, but it could, so let's put it in commit – we need to make it [the pipeline] look better."  CW5 agreed that the Company's sales teams were pressured from Anaplan's leadership to commit to deals prematurely.

42.    Corroborating CW7's and CW6's accounts, CW8 reported that in contrast to CW8's

previous employers, CW8's sales managers pressured salespeople to exaggerate the likelihood of deals closing in their pipelines instead of asking salespeople to provide accurate assessments of their potential deals. CW7 similarly observed a lot of exaggeration in the pipeline, and that, as a result, Anaplan's sales forecasts were often distorted. Moreover, in discussions with CW8's regional vice president about Anaplan's culture of unrealistic expectations, the regional vice president expressed discomfort and conveyed that the pressure on the sales team and pipeline expectations was coming from above.

**B.      Overcommits Inflated Anaplan's Growth Projections**

43.      As a result of the ongoing pressure to overcommit sales each quarter, Anaplan's billings projection was artificially inflated. CW7's supervisor, Deb Kennedy, explained to CW7 that she and Anaplan's other sales managers ran the Company's sales forecasting model each week, and reported it to everybody in the Company's leadership. CW2, then Anaplan's Vice President of Financial Planning and Analysis, recalled that Calderoni was so fixated on billings projections that he directly involved himself with sales teams whenever the projections were below quota.

44.      CW2 and his Director of Sales Finance, Haining Yu ("Yu"), developed the software model to project billings and billings growth for the quarter. CW2 explained that this model incorporated the projections that had been populated by Anaplan's sales managers, including Deb Kennedy and Mark Donsky. Thus, the projections by design would be inflated by the inflation of commits described above in ¶¶39-42.

45.      CW7 agreed that, due to the above forecasting practices, commits were consistently pushed to later quarters. And even when a deal closed, it was often at a fraction of what had been projected. As an example, CW7 said that when CW7 left Anaplan in December 2019, CW7 knew that one of CW7's deals with a large video game developer would be delayed. CW7 said that while the deal had originally been forecast to close in the fourth quarter of fiscal year 2020 at $1.3 million, it eventually closed in the first quarter of fiscal year 2021 (*i.e*, February to April, 2020) for $400,000.

46.      Excessive pressure, unrealistic sales quotas, and fallout from blown commits took their toll on Anaplan's sales department. CW6 observed an extremely high turnover rate at all levels of Anaplan's sales department, from salespeople and regional vice presidents to executives. CW6 added

1    that although the Company hired lots of salespeople, sales managers were under pressure to fire them

2    quickly if they could not meet excessive sales quotas.  CW6 heard the Company's senior sales

3    leadership refer to this practice as "hire fast and fire faster."

4         47.    CW4 reported that Calderoni chased away Anaplan's best sales and marketing people,

5    including Anaplan's head of customer relations, the head of analyst relations in marketing, and the

6    head of field marketing.  Calderoni and Morton also drove off Anaplan's Global Customer Officer,

7    Paul Melchiorre.  CW9[3] and CW10[4] characterized Melchiorre as Anaplan's "ultimate sales guy,"

8    whom the Company's customers and "true believers" held up as a "guru" of Anaplan's platform.

9    According to CW6 and CW9, Melchiorre left in September 2019.  CW4 observed that while Calderoni

10   was able to attract quality employees, he fostered a culture that was too tough and too hostile for those

11   employees to stay.

12        48.    Among them was Anaplan's most recent Chief Growth Officer, Mark Anderson, whom

13   Anaplan hired August 5, 2019.  *See Anaplan Welcomes Mark Anderson as Chief Growth Officer*,

14   *available   at*:   https://www.anaplan.com/press-releases/anaplan-welcomes-mark-anderson-as-chief-

15   growth-officer/ (Aug. 5, 2019).  Prior to joining Anaplan, Anderson had spent over six years as Palo

16   Alto Networks' President and Chief Revenue Officer, and, prior to that, as F5 Networks' Executive

17   Vice President of Worldwide Sales.  *Id.*  Calderoni touted Anderson's "talent and breadth of

18   knowledge . . . as a visionary growth leader" with "deep experience driving sustained growth and

19   scale, and . . . [a] passion for building exceptional teams." *Id.*  CW4 characterized Anderson as a "rock

20   star sales guy" who agreed to be Anaplan's Chief Growth Officer as a favor to Calderoni.  An analyst

21   at Rosenblatt Securities reported that "several industry sales executives" consider "Anderson . . . one

22   of the most respected sales executives in the industry" and that "Mr. Anderson is already attracting

23   top sales talent to PLAN."  Yun Kim, *PLAN: Checks Indicate Steady Business Trends*, Rosenblatt

24

25        [3] CW9 was an Enterprise Business Development Representative at Anaplan from October 2017
26   to July 2020.  CW9 was based in Minneapolis and reported to Nick Nussberger, Sales Development
     Manager, who in turn reported to Heather Cange, Director of Sales Development.

27        [4] CW10 was a Corporate Strategic Advisor at Anaplan from January 2020 to April 2020.  CW10
28   was based remotely and reported to CW4, Vice President of Corporate Marketing.

Securities Inc. (Nov. 17, 2019). Due to Anderson's hiring, Rosenblatt added "our view [is that] PLAN is building what could be perhaps the most enterprise-ready sales organization outside the large tech bellwethers" and "could turn into one of the best executing software companies in recent history." *Id.*

49.     Internally, however, Calderoni quickly clashed with Anderson. According to CW4, Calderoni regularly interfered with Anderson's efforts to improve Anaplan's sales operation and growth.

50.     Reports from former employees that were posted on the workplace-review site Glassdoor.com corroborate the accounts cited above from numerous confidential witnesses. According to a May 4, 2020 review from a former sales consultant who worked at Anaplan full-time for at least one year, "[t]he good people leave this company as soon as they realize the load of non-sense happening here. . . . The senior staff of this company has been a revolving door which has left the execution and strategy in shambles on the floor." Another review posted on December 28, 2019 agreed: "I've never in my entire career worked in a place where the level of 'cover up', fake promises, dishonesty, and lack of transparency exists." The review added, "The amount of turnover in the company is astounding. Sales positions are a revolving door. New postings are 99% refilling positions that have been left for good reason."

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

### A. The November 21 Earnings Call

51.     On November 21, 2019, at the market open, Defendants conducted an earnings conference call with investors and analysts (the "November 21 Earnings Call"). During the November 21 Earnings Call, Anaplan and Calderoni stated:

> It was also a historic year for us, where we established our leadership position in the Connected Planning category, which was demonstrated by our consistent topline growth.
>
> We also received recognition from industry analyst, we continue to expand our customer base, partner ecosystem and our community overall. ***In addition, we were able to attract impressive leaders and innovative talent, who will continue to elevate us further.***
>
> And finally, what I am most excited about is that we're just getting started and ***we have a lot more momentum ahead of us***. When I look back at this past year as a public

company, I'm most proud of the accomplishments our teams have delivered and continuing this trend, I am pleased to report another strong quarter.

52.     The statements in ¶51 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because they omitted that: (a) then-existing widespread problems within Anaplan's sales force, including leadership disputes, excessive turnover, and unrealistic quotas and extreme sales pressure threatened Anaplan's sales momentum and ability to retain "impressive leaders and innovative talent;" and (b) Anaplan inflated its projected billings growth by pressuring sales representatives to inflate the probability that a potential sale would close within the given period, and to mark such potential sales as "commits" when they did not qualify for the applicable criteria.

53.     During the same November 21 Earnings Call, Anaplan and Morton told the market that:

> Total revenue for the quarter was $89 million, up 44% year-over-year. Within this, subscription revenues grew 47% and comprised 89% of total revenue. Service revenues were $10 million, up from $8 million in the third quarter last year and down sequentially $1.2 million as we continue to deemphasize generating revenue from professional services.  Calculated billings of $114 million grew 59% year-over-year. Our remaining performance obligation, or RPO balance, as we exited the third quarter was $590 million, up 55% over last year. This is the third consecutive quarter of RPO growth above 50%.
>
> * * *
>
> **_For the full fiscal 2020, we are raising our revenue and operating margin outlook driven by the third quarter performance and ongoing strength we see in our business._**
>
> For the full-year, we expect total revenue to be in the range of $346 million to $347 million. And as previously stated, calculating billings can fluctuate from quarter-to-quarter, impacted by timing of renewals and transactions. However, **_we believe billings to track in line with overall revenue growth rates and our net dollar expansion rate to remain above 120%._**

54.     Later, during the question-and-answer part of the November 21 Earnings Call, an analyst asked Defendants for advice regarding "deferred patterns" that might be considered in the analyst's models. In response, Anaplan and Morton reassured the market that:

> So for us that continues to be in this growth mode. **_I would tell you that we would continue on at the rate and pace as we guide our performance this year within the lines of the preliminary guidance we gave for next fiscal year._**

55.     The statements in ¶¶53-54 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they

1  were made because they omitted that: (a) then-existing widespread problems within Anaplan's sales

2  force, including leadership disputes, excessive turnover, and unrealistic quotas and extreme sales

3  pressure threatened Anaplan's sales momentum and undermined the conclusions Morton and Anaplan

4  encouraged investors to draw from the Company's third quarter performance and the "strength we see

5  in our business"; and (b) despite pressuring sales representatives to inflate the probability that a

6  potential sale would close within the given period, and to mark such potential sales as "commits" when

7  they did not qualify for the applicable criteria, Anaplan's billings were then not growing "in line with

8  overall revenue growth rates" or "at the rate and pace . . . within the lines of the preliminary guide we

9  gave for next fiscal year."

10         56.    During another exchange, an analyst asked Calderoni to discuss Anaplan's "sales

11  organization, and kind of how will we see it reflected in the numbers around sales productivity . . . as

12  we continue to go along?"  Calderoni responded in part:

13         Well, so I think, we've talked about this over the past year, because you get productivity
        by getting much more leverage in the investment that you're making. So let's talk about
14         the customer. If you look at where our lands were a couple of years ago versus where
        they are right now, we've seen a significant increase, and it continues to increase. And
15         then as I mentioned a few minutes ago, we're also seeing the expands happen sooner
        and the expands be larger. I think that goes into kind of the strategy that we're working
16         with, which is – we basically are deploying enterprise, sales, men and women that work
        with our customers, that are concentrated on a few accounts. We encourage them to
17         work closely with partners, partners allow us to get higher in the organization and
        enterprises as well as connect to certain transformation projects that are underway. And
18         when you start to make all those connecting points, and you start to see that flywheel
        as far as larger lands and then faster and larger expands is where you start to drive the
19         productivity, and that's where – that's what we've been focused on this year has been
        better than last year, next year will be better than this year, and that's kind of the
20         multiyear plan that we're on.

21         And one of the things, it's great to have Mark join. This is now his four months in
        Anaplan. He comes Mark Anderson, he comes with a tremendous amount of experience
22         having gone through two previous companies going through the rapid growth, and
        ***Mark is even helping us now kind of go to that next level, which is how do we
23         continue this process, continue the productivity, continue the connection with some
        of these large experienced partners that we have. And I think, we'll continue to see
24         benefit as we continue down that path.***

25         57.    The statements in ¶56 above were materially false and/or omitted material information

26  necessary to make the statements not misleading under the circumstances in which they were made

27  because they omitted that: (a) Anaplan's sales force was not continuing to increase productivity, but

28  rather was becoming less productive as measured by decreasing billings growth, decreasing quality of

commits, and excessive turnover; (b) promotion of Mark Anderson's experience in driving sales productivity was imperiled by Calderoni's and Morton's overruling of his sales plans; and, as a result of (a) and (b) at the time these statements were made, Anaplan was already not in position to "go to that next level" of sales.

58.    Later, an analyst asked Defendants:

> [J]ust a couple of very quick high-level questions. One is macro just a sanity check, certainly from the strength of the quarter doesn't sound like there's any kind of macro concerns or anything that you saw in the quarter and especially the guidance that you gave for next year. So, maybe just if you have any commentary on that.
>
> And then also as far as your sales organization, how are you guys thinking about the— your sales organization with Mark Anderson being on board now for a little bit, as you're heading into Fiscal '21 any changes that you're thinking of making? Or any tweaks?

Calderoni responded:

> First on the macro, ***we are not seeing any changes in the macro environment or within deal cycles or anything like that. So I would say, nothing that we've observed more recently.*** As far as Mark, as I mentioned before, it's great to have Mark on board with the expertise that he brings. This is we are in a fortunate situation where we're early in the market as I said before we've got a long road ahead of us and we're making investments, significant investments, because we see the opportunity there. ***Mark has been focused in the first couple of months, clearly, on ensuring that we continue to have the right skills and the talent*** and also to continue to work with our partners as I talked about before to expand because his -- ***the great thing about having Mark on board, is he has the view of as we continue to look out what is necessary as we continue to scale, if we want to think about getting to $1 billion or even beyond that.*** He's been there before, he's done it and so that's great insight to have and ***he's helping the team that we've developed over the last couple of years, move up to that next level as we get ready for '21***.

59.    The statements in ¶58 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because they failed to disclose that: (a) the growth of Anaplan's billings was then slowing, which was a "change[] in the macro environment or within deal cycles" from previous quarters; (b) Anaplan did not, at the time of the statements "have the right skills and talent" on its sales team, largely as the result of its "hire fast and fire faster" practice and its forcing out of Melchiorre, a key sales executive; (c) known, then-existing morale problems within Anaplan's sales force, leadership disputes, excessive turnover, and unrealistic quotas and extreme sales pressure impaired the ability of Anaplan's sales team to "move up to that next level;" and (d) Anaplan inflated its projected billings growth by

1   pressuring sales representatives to inflate the probability that a potential sale would close within the

2   given period, and to mark such potential sales as "commits" when they did not qualify for the

3   applicable criteria.

4       60.   Investors were thrilled with Anaplan's results, sending Anaplan's share price up over

5   8% to close at $53.09 per share.  Terry Tillman, an analyst at SunTrust Robinson Humphrey, wrote

6   that the results were "highlighted by strong subscription revenue upside/growth . . . and a big beat on

7   billings (highest growth since going public)."  Terry Tillman, *Huge Billings Beat, Strong RPO in 3Q;*

8   *Honeycomb Oozing with Honey; Reiterate Buy*, SunTrust Robinson Humphrey (Nov. 21, 2019).

9   SunTrust raised billings estimates "across the board," noting that the billings upside "bode[s] well for

10  growth . . . given the correlation between billings and the following year subscription revenue."  *Id.*

11  Meanwhile, Alex Zukin, an analyst at RBC Capital Markets, noted that Anaplan "somewhat

12  surprisingly posted initial FY21 top line guidance ahead of consensus expectations…."  Alex Zukin,

13  *3Q Recap: Got those Billings in My Pocket*, RBC Capital Markets (Nov. 21, 2019).  RBC made clear

14  that the billings enthusiasm of professional investors was the direct result of statements by Anaplan's

15  management: "Any way we try to slice this [billings] number implies that subscription revenue growth

16  could accelerate from current levels *as management has noted that over time calculated billings*

17  *growth and subscription revenue growth should converge*."  *Id.* (emphasis added).

18      **B.   The December 2019 Form 10-Q**

19      61.   After the market closed on December 9, 2019, Defendants filed with the SEC

20  Anaplan's Form 10-Q for the third fiscal quarter of 2020.  This Form 10-Q was signed by Morton and

21  contained signed Sarbanes-Oxley certifications from Calderoni and Morton, each certifying to the

22  accuracy of the language contained in the filing.

23      62.   Item 2 of Form 10-Q requires SEC registrants to furnish the information called for

24  under Item 303 of Regulation S-K [17 C.F.R. §229.303] as part of Management's Discussion and

25  Analysis of Financial Condition and Results of Operations ("MD&A").  Among other things, Item

26  303 of Regulation S-K required that Anaplan's Class Period Form 10-Q disclose a description of "any

27  known trends or uncertainties that have had *or that [Anaplan] reasonably expects will have a material*

28  *favorable or unfavorable impact* on net sales or revenues or income from continuing operations."  17

1   C.F.R. § 229.303(a)(3)(ii) (emphasis added).

2        63.    The SEC issued interpretative guidance associated with the requirements of Item 303

3   of Regulation S-K concerning the disclosure of material events or uncertainties. The interpretative

4   guidance states, in pertinent part, as follows:

5        A disclosure duty exists where a trend, demand, commitment, event or uncertainty is
         both presently known to management and reasonably likely to have material effects on
6        the registrant's financial condition or results of operation.

7                                          *  *  *

8        Events that have already occurred or are anticipated often give rise to known
         uncertainties. For example, a registrant may know that a material government contract
9        is about to expire. The registrant may be uncertain as to whether the contract will be
         renewed, but nevertheless would be able to assess facts relating to whether it will be
10       renewed. More particularly, the registrant may know that a competitor has found a way
         to provide the same service or product at a price less than that charged by the registrant,
11       or may have been advised by the government that the contract may not be renewed.
         The registrant also would have factual information relevant to the financial impact of
12       non-renewal upon the registrant. In situations such as these, a registrant would have
         identified a known uncertainty reasonably likely to have material future effects on its
13       financial condition or results of operations, and disclosure would be required.

14  *See SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results*

15  *of Operations; Certain Investment Company Disclosures*, SEC Release Nos. 33-6835;35-26831; IC-

16  1691; FR-36, *available at*: https://www.sec.gov/rules/interp/33-6835.htm (May 18, 1989).

17       64.    Although Defendants had a duty to disclose known trends in the December 9, 2019

18  Form 10-Q, Defendants violated their disclosure duty by failing to discuss known adverse trends and

19  uncertainties.  Specifically, Defendants omitted discussion (either in the MD&A or any other section)

20  in Anaplan's Form 10-Q: (a) that billings growth was slowing and was not expected to continue at the

21  pace observed previously; (b) that excessive turnover in the sales department was becoming

22  problematic, driven by rapid firing, a caustic work environment, and unachievable quotas; and (c) that

23  key sales leadership, including Paul Melchiorre, had already been driven from the Company.  The

24  MD&A disclosures in Anaplan's Form 10-Q were materially false and misleading because of these

25  omissions.   The undisclosed material uncertainties, which were known to management, were

26  reasonably likely to have a material effect on the Company's future operating results.

27       65.    In the December 9, 2019 Form 10-Q, under the heading labeled "Factors Affecting Our

28  Performance", where the Company discussed the "[s]caling [of its] sales team," Defendants

represented:

> Our ability to achieve significant growth in revenue in the future will depend, in large part, upon the effectiveness of our sales efforts, both domestically and internationally. We have invested and intend to continue to invest aggressively in expanding our direct sales force, particularly in attracting and retaining sales personnel with experience selling to larger enterprises. ***We are continually hiring significant numbers of sales personnel and our ability to increase our revenue will depend on the new members of our sales force becoming fully productive***. In the enterprise market, a customer's decision to use our platform may be an enterprise-wide decision. These types of sales require us to provide greater levels of education regarding the use and benefits of our platform, which involves substantial time, effort, and costs. We anticipate that our headcount will continue to increase as a result of these investments.

66.     The statements in ¶65 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because they omitted that: (a) the principal reason behind the Company's "continual[] hiring [of] significant numbers of sales personnel" was not an expansion in sales but was a symptom of the Company's "hire fast and fire faster" policy, which was exacerbating turnover at the Company, and the turnover caused by endemic pressure to overcommit to inflated sales quotas; (b) widespread problems besides hiring prevented Anaplan's sales force from "becoming fully productive," including morale problems within Anaplan's sales force driven by caustic pressure from Calderoni and Morton, leadership disputes, and unreachable quotas.

67.     Moreover, Anaplan's Fiscal Third Quarter 2020 10-Q contained generic, boilerplate risk warnings that were themselves misleading because what the Company cast as a potential risk had already come to fruition.  Specifically, Anaplan claimed that:

> ***Our corporate culture promotes visionary thinking, teamwork and creativity***, and if we cannot maintain this culture as we grow, it could harm our business.
>
> Our corporate culture promotes an entrepreneurial mindset that has contributed to our success, and if we cannot maintain this culture as we grow, we could lose the core principles that have fueled our growth. We believe that our culture has been and will continue to be a key contributor to our success. ***We hope to maintain our growth trajectory and will continue to hire aggressively as we expand, especially*** engineering, research and development and ***sales personnel.*** If we do not continue to maintain our corporate culture as we grow, we may be unable to foster the innovation, creativity, and entrepreneurial spirit we believe we need to support our growth. Even when we hire aggressively, we may not be able to effectively integrate new hires in our fast-paced culture. Our aggressive focus on increasing our headcount and our transition from a private company to a public company may result in a change to our corporate culture, which could harm our business and results of operations.

68.     The statements in ¶67 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because (a) at the time this statement was made, Calderoni and Morton did not promote "visionary thinking, teamwork and creativity" as Anaplan's sales culture, but maintained a toxic environment, driving out key sales executives; (b) Anaplan's need to aggressively hire sales personnel was not merely the result of growth but also a problem caused by excessive turnover; and (c) as a result of the excessive turnover, caustic pressure from Calderoni and Morton, leadership disputes, and unreachable quotas, the Company was then unable "to effectively integrate new hires," undermining Anaplan's "growth trajectory."

### C.     The Barclays Global Technology, Media and Telecommunications Conference

69.     On December 11, 2019, Morton spoke at the Barclays Global Technology, Media and Telecommunications Conference in Los Angeles, California (the "Barclays Conference").

70.     During the Barclays Conference, the moderator asked Morton:

> Then since the IPO, like a normal IPO was kind of high growth and then because the law of large numbers, there's a deceleration. And I think there's just a law of large numbers. But with you guys, it was actually kind of –we actually saw last year over the last few quarters, like, actually an acceleration of growth. Like, can you talk to kind of what happened there? Like that's pretty unique in the industry.

> * * *

> I don't know, correct me if I'm wrong.  It feels deliberate it's like Frank [Calderoni] and you have been in large organizations and have been in the industry for a long time. It feels a little bit like it's just the normal standard—well, it's still tough to do. But it's still the normal standard of blocking and tackling.  This is how you scale the business. And if I think I also listen to you and Frank, it's kind of very much like, look, you need skill sales organization, sales enablement, you need to go over the partner program, kind of enable the partners and that kind of across the business, et cetera. So is it a little bit like that? Or I mean it's not—I think.

Morton responded in part that:

> **[T]o us, it's like reading keys on a piano. It's pretty straightforward.** Like I love our platform. Our platform is amazing. And trust me, I've used things dating all the way back to when I first started at Seagate, we have Crystal Decisions to use business objects, to finish Hyperion to Adaptive to Anaplan. And just have that core experience. I mean I am just—I have seen second to none across all my situational and operational experiences as well.

> So then when I think about how do you scale an organization and if you look at the rest of the executives around the table that Frank has been able to hire. It's just been simply less than—it's just been amazing. ***And so when you think about that cohort, I mean,***

*everybody around our table has been in some sort of executive kind of position at a public company north of $1 billion. And that's really kind of our framework*.

71.     The statements in ¶70 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because they omitted that (a) then existing widespread problems within Anaplan's sales force, including leadership disputes, excessive turnover, and unrealistic quotas and extreme sales pressure threatened Anaplan's sales momentum; (b) Anaplan's billings growth was then stagnating if not decelerating, not accelerating; and (c) Anaplan inflated its projected billings growth by pressuring sales representatives to inflate the probability that a potential sale would close within the given period, and to mark such potential sales as "commits" when they did not qualify for the applicable criteria; all of which (d) undermined the "straightforward" strategy touted to the market.

**D.    December 13, 2019 CNBC Appearance**

72.     On December 13, 2019, Calderoni appeared on CNBC's *Mad Money* to discuss Anaplan's growth with Jim Cramer. *Available at*: https://www.cnbc.com/video/2019/12/13 /anaplan-ceo-predicts-dramatic-shift-in-business-planning.html.

73.     During the interview, Cramer said, "This is really important, people, the billings accelerator.  They were already at 46%, you hit 59%. Frank, how does someone go from 46% to 59% acceleration? Calderoni responded:

> I think it's kind of the space we're in. If you kind of think about the backdrop and also SaaS companies in total, the whole digitization is really starting to accelerate. And this is a global phenomenon. I was in Japan over the summer too and it was interesting to kind of see where the Japanese companies are really kind of advancing their focus on digitization. So I think that as a backdrop is forcing companies to take a different look at what they're doing on the planning space. And so, we're taking - *we've got a great platform that we can offer great value in a reasonable amount of time for companies to implement Anaplan and then also accelerate and that's really what's driving our growth.* We're increasing the number of customers, the customers that we currently have are continuing to add to the use of the Anaplan within their companies and so that's great to see.

74.     The statements in ¶73 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because they omitted that: (a) Anaplan's billings growth was then stagnating if not decelerating, not accelerating; (b) then-existing widespread problems within Anaplan's sales force, including leadership

1  disputes, excessive turnover, and unrealistic quotas and extreme sales pressure already threatened

2  Anaplan's sales momentum; (c) Anaplan inflated its projected billings growth by pressuring sales

3  representatives to inflate the probability that a potential sale would close within the given period, and

4  to mark such potential sales as "commits" when they did not qualify for the applicable criteria; and

5  (d) as a result of (a), (b) and (c) "accelerat[ion]" was not "driving . . . growth."

6  **THE TRUTH EMERGES**

7      75.    On February 27, 2020, Defendants conducted an earning call regarding Anaplan's

8  results for its fiscal fourth quarter of 2020.  During the February 27, 2020 call, the Company disclosed

9  that its calculated billings of $126 million had grown only 25% from the previous year.  This growth

10  rate was a major departure from its year-over-year revenue growth of 42%, well below consensus

11  estimates, and was roughly half of the Company's historical growth rates of 46% to 59%.  In his

12  prepared remarks, Morton blamed Anaplan's lackluster calculated billings growth rate on

13  "management changes" that "affected alignment around some key near-term opportunities, . . .

14  resulting in a lower-than-anticipated growth in billings."  Calderoni also announced that after only a

15  few months at Anaplan, Anderson was "step[ping] back from his full-time role to spend more time

16  with his family."

17      76.    Analysts immediately jumped on the Company's announcement of its gloomy billings-

18  growth rate and Anderson's departure.  Regarding "the impact of the slipped deals," RBC observed

19  that "the company did not provide clarity around the number of slipped deals, size of the total

20  opportunity, nor timing of the potential recovery. While affirming that these deals were not lost, the

21  lack of commentary that would suggest some have closed, or are expected to close near term, is

22  concerning."  Alex Zukin, *F4Q20 Earnings: Billings Miss Amid Sales Re-Org*, RBC Capital Markets

23  (Feb. 27, 2020).

24      77.    Analysts saw through the false explanation for Anderson's departure.  RBC noted that

25  Calderoni's statement about Anderson leaving to spend more time with family "diverge[d]" with its

26  "checks . . . suggesting that Mark Anderson's departure came after a difference of opinion with the

27  CEO."  *Id.*  Barclays suspected that "the departure of the only recently hired Chief Growth Officer

28  [Anderson] hints at deeper issues."  Raimo Lenschow, *First Take – Billings Miss Main Question for*

*Investors Post Q4*, Barclays (Feb. 27, 2020).  Michael Turrin, an analyst at Wells Fargo wrote that "billings growth [that was] well below expectations" and "[t]he sudden departure of Chief Growth Officer Mark Anderson . . . is an admittedly tough combo to swallow."  Michael Turrin, *PLAN: Billings Miss + Head of Sales Departure = Tough FQ4 Combo*, Wells Fargo Securities (Feb. 27, 2020).  RBC similarly concluded that "[g]iven the lack of details around the billings miss, the concerning departure of a well-respected and talented leader, and the general market environment, we expect shares to underperform in the interim."

78.    As a result of these disclosures, Anaplan's stock price plummeted 25% on February 27, 2020, falling from $58.09 to $44.03, wiping out over $1 billion in market cap in a single day, on record-setting volume that exceeded the volume on its IPO day by 125%.

## ADDITIONAL ALLEGATIONS OF SCIENTER

79.    Numerous additional facts demonstrate that Defendants acted at least recklessly in making the material misstatements and omissions concerning Anaplan's sales process.

80.    First, as described above, Defendants Anaplan, Calderoni and Morton repeatedly spoke to investors about and claimed to understand Anaplan's billings growth, sales force needs and productivity, and deal cycles.  Defendants thus either knew these statements were not true when made, or recklessly chose not to inform themselves about the actual state of these issues before making positive statements to investors during the Class Period.

81.    Second, numerous former employees noted that Calderoni's management style involved micromanagement and personal involvement with day-to-day sales leadership and below-quota sales teams. *See* ¶¶36-37, 43.  Moreover, between April 2019 and August 2019, Calderoni personally took on the duties of Chief Revenue Officer until Anaplan hired Anderson in August 2019. Thus, it is implausible that Calderoni would not have actual knowledge of the widespread problems within Anaplan's sales division.

82.    Third, Defendants received reports throughout each quarter before, and during the Class Period, regarding the Company's actual and projected billings, which would inform them of slowing growth and lengthening deal cycles. Each month, at the Company's CFO meeting, Defendant Morton received reports of actual bookings, billings, and backlog, as well as a separate report that

included all current invoices and assessed calculated billings.  In addition to reports regarding the Company's existing billings, Calderoni and Morton each regularly received reports about the Company's projected billings.  In particular, CW2 stated that at the beginning of each quarter, CW2 reported the Company's billings projections to Morton and Calderoni, and updated reports during the quarter itself.

83.    <u>Fourth</u>, Anaplan is a planning company; its platform has the capability to, *inter alia*, "[a]nalyze sales forecasts . . . to any level of granularity," "[a]lign real-time sales forecasts with sales planning models and metrics," "[c]alculate quota attainment," "[p]rovide accurate, up-to-date sales forecasts to leaders across the organization," "[a]nalyze patterns using time-based dashboards and key performance indicators," and "[p]rovide actionable intelligence with Predictive Insights to more effectively optimize pipeline and shore up sales forecast strength."  *See* ¶¶26-27.  During the Barclays Conference, Morton confirmed that "we definitely drink our own champagne. . . . [W]e're doing everything from forecasting ESPP or 401(k) matching, ***to bookings, the billings***, we've put all of our ASC 842 leaseholds, ***to all of our beat-and-raise models*** and so on and so on."[5]  Given the above capabilities of Anaplan' s platform, which Morton admits the Company used to forecast billings, Defendants knew, or were reckless in not knowing that Anaplan's billings growth was slowing and was not tracking the Company's revenue growth.

84.    <u>Fifth</u>, Defendants acknowledged understanding that Anaplan's sales department and sales leadership were critically important to Anaplan's success.  As the Company acknowledged in its Fiscal Second Quarter 2020 10-Q, "[o]ur success depends upon the continued services of our key executive officers and certain key employees . . . in the areas of business strategy, research and development, ***marketing, sales,*** services, and general and administrative functions. . . . The loss of one or more of our executive officers or key employees could have a serious effect adverse effect on our business."  At the same time, however, Calderoni admitted to CW4 that Anaplan had a big morale

---

[5] "'Drinking your own champagne' is a slang term . . . which describes the practice of a company using its own products, either to test drive it before the release or to show confidence in it."  Raphaela Brandner, *Drinking Our Own Champagne*, The Creativity & Productivity Blog, *available at*: https://www.mindmeister.com/blog/drinking-our-own-champagne (last visited Jan. 6, 2021).

problem.  Moreover, Defendants knew that one of the most senior and long-term sales executives, Melchiorre, had been driven from the Company, that other sales leaders were fleeing the Company, and that there was a high level of turnover in Anaplan's sales force.  *See* ¶¶46-50.

85.     Sixth, during the Class Period, Anaplan's insiders, including Defendants Calderoni and Morton, took advantage of Anaplan's artificially inflated stock price and reaped a total of nearly $21 million from sales of Anaplan common stock on the open market:

**Calderoni's Class Period Stock Sales:**[6]

| Date | Shares Disposed | Price | Proceeds |
|---|---|---|---|
| 11/21/2019 | 40,800 | 54.8272 | $ 2,236,949.76 |
| 12/10/2019 | 29,200 | 51.635 | $ 1,507,742.00 |
| 12/10/2019 | 800 | 52.2625 | $      41,810.00 |
| 1/2/2020 | 5,043 | 54.0091 | $    272,367.89 |
| 1/3/2020 | 9,957 | 54.0371 | $    538,047.40 |
| 1/10/2020 | 40,211 | 56.8606 | $ 2,286,421.59 |
| 1/10/2020 | 4,789 | 57.7512 | $    276,570.50 |
| 2/3/2020 | 100 | 60 | $        6,000.00 |
| 2/4/2020 | 51,122 | 60.6798 | $ 3,102,072.74 |
| 2/4/2020 | 42,374 | 61.3428 | $ 2,599,339.81 |
| 2/10/2020 | 28,238 | 60.5314 | $ 1,709,285.67 |
| 2/10/2020 | 16,762 | 60.9394 | $ 1,021,466.22 |
| **Total** | **269,396** | | **$15,598,073.58** |

86.     These sales were unusual both in terms of total number of shares sold and the amount of proceeds reaped from the sales of Anaplan's artificially inflated stock price.  Calderoni's sales leading up to the Class Period were regular: he sold 30,000 shares of Anaplan stock on or around the

---

[6] Excluded from this chart are proceeds from shares indicated as sold in order to cover tax withholding obligations.

1    tenth day of the month in September, October, and November.  After Defendants artificially inflated

2    Anaplan's stock price, however, Calderoni ramped up his stock sales to 45,000 shares per month and

3    began selling additional shares outside of his usual window of the tenth day of the month.  In particular,

4    on the day of the November 21 Earnings Call, Calderoni sold 40,800 shares of Anaplan stock.  On

5    January 2 and 3, 2020, Calderoni sold a combined 15,000 shares of Anaplan stock.  Moreover, on

6    February 2 and 3, 2020, just weeks before Defendants reported what would be Anaplan's worst

7    billings-growth rate to date, Calderoni sold 93,596 shares of Anaplan stock, realizing over $5.7 million

8    in proceeds from those two days alone.

9        87.    The misrepresentations of material facts also allowed other insiders to sell shares of

10   Anaplan stock at inflated prices.  This included Morton, who on December 20, 2019, sold 25,000

11   shares of Anaplan stock at a price of $53.0007 per share, allowing him to reap $1,325,017.50 in

12   proceeds.  In addition, on December 20, 23, 24, and 26, 2019, Rob Ward, a member of Anaplan's

13   Board of Directors and its Audit Committee, sold 219,197 shares of Anaplan stock, reaping $3,896,030

14   in proceeds.

15                                    **NO SAFE HARBOR**

16       88.    Defendants' liability for their securities fraud is not protected by the safe harbor for

17   certain forward-looking statements, under the Private Securities Litigation Reform Act of 1995, 15

18   U.S.C. §78u-5(c).  First, the statements made either were not forward-looking at all, or embedded false

19   statements and material omissions of present facts.

20       89.    To the extent any could be characterized as forward-looking, they lacked meaningful

21   cautionary language.  None specifically identified the risks concealed by the misrepresentations and

22   omissions alleged herein, including then-existing problems within Anaplan's sales department,

23   including a caustic environment, departures of key executives, excessive turnover among salespersons,

24   and inflation of sales projections.  Moreover, as specified in ¶¶67-68, *supra*, Anaplan's "risk

25   disclosures" were themselves materially false and misleading.

26       90.    Additionally, Anaplan's discussion of billings was articulated in a manner designed to

27   ensure that investors did not understand applicable risks.  Although Anaplan acknowledged that

28   "[i]nvestors or analysts sometimes look to the sum of revenue and changes in deferred revenue,

1  sometimes referred to as '*estimated billings*,' as an indicator of business activity in a period for

2  businesses such as ours," and raised exceptionally general comments about the accuracy of '*estimated*

3  *billings*,' they did not make a single reference in any cautionary statement to the "*calculated billings*"

4  term they used in their misleading positive statements to investors. By design, this rewording not only

5  discouraged investors from understanding any risk attached, but also made it appear that the figure

6  was in fact definite rather than estimated.

7      91.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-

8  looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking

9  statements because at the time each of those forward-looking statements was made, the particular

10 speaker knew that the particular forward-looking statement was false, and/or the forward-looking

11 statement was authorized and/or approved by an executive officer of Anaplan who knew that those

12 statements were false when made.

13                          **CLASS ACTION ALLEGATIONS**

14     92.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure

15 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise

16 acquired Anaplan securities between November 21, 2019 and February 26, 2020, both dates inclusive,

17 and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, former and

18 current officers and directors of the Company, members of their immediate families and their legal

19 representatives, heirs, successors, or assigned, and any entity in which any Defendant has or had a

20 controlling interest.

21     93.    The members of the Class are so numerous that joinder of all members is impracticable.

22 While the exact number of Class members is unknown to Plaintiff at this time and can only be

23 ascertained through appropriate discovery, Anaplan disclosed in its Form 10-K filed with the SEC on

24 March 29, 2019 that there were 569 registered stockholders of record of Anaplan's common stock as

25 of March 20, 2019, and that the Company "believe[s] a substantially greater number of beneficial

26 owners hold shares through brokers, banks, or other nominees." Accordingly, Plaintiff believes that

27 there are at least hundreds or thousands of members of the proposed Class. Throughout the Class

28 Period, Anaplan had a large public float consisting of more than 80 million shares that traded actively

1   on the NYSE.  Class members may be identified from records maintained by Anaplan or its transfer

2   agent, institutional filings, and the records of brokers holding such securities in street name for their

3   clients, and may be notified of the pendency of this action by mail, using the form of notice similar to

4   that customarily used in securities class actions.

5        94.   Common questions of law and fact exist as to all members of the Class and predominate

6   over any questions solely affecting individual members of the Class. Among the questions of law and

7   fact common to the Class are:

8       A.   Whether Anaplan, Calderoni, and Morton made affirmative misrepresentations and/or

9          omitted material information to investors regarding then-known negative material

10         information regarding the Company's sales process, which undermined the

11         Defendants' positive statements about Anaplan's sales department and its present

12         ability to continue its growth trajectory;

13      B.   Whether Calderoni and/or Morton traded shares of Anaplan stock while in possession

14         of material, nonpublic information regarding Anaplan;

15      C.   Whether Defendants' misrepresentations and omissions violated federal securities

16         laws;

17      D.   Whether Defendants' misrepresentations and omissions were material;

18      E.   Whether Defendants acted with scienter;

19      F.   Whether Calderoni and Morton were control persons of Anaplan, and whether

20         Calderoni was a control person of Morton, and thus secondarily liable for their primary

21         violations;

22      G.   Whether the prices of Anaplan securities during the Class Period were artificially

23         inflated because of Defendants' conduct complaint of herein; and

24      H.   Whether the members of the Class have sustained damages and, if so, what is the proper

25         measure of damages.

26       95.   Plaintiff's claims are typical of the claims of the members of the Class as all members

27  of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, and

28  all assert the same legal claims arising out of the same conduct.

96.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has no interests antagonistic to the Class, and has retained highly experienced counsel specializing in securities litigation.

97.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

98.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- During the Class Period, Defendants made public misrepresentations of material facts and failed to disclose material facts necessary to make the statements they publicly made during the Class Period not misleading under the circumstances in which they were made;

- Anaplan shares traded in an efficient market;

- Anaplan shares were liquid and traded with moderate to heavy volume during the Class Period;

- Anaplan shares traded on the NYSE and the Company was covered by multiple analysts, journalists, and industry commentators;

- The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Anaplan shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

99.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

100.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United*

*States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of Securities Exchange Act of 1934
### and Rule 10b-5 Promulgated Thereunder
### <ins>Against All Defendants</ins>

101.    Plaintiff restates and realleges each and every paragraph above as though fully set forth herein.

102.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

103.     During the Class Period, Defendants engaged in a plan, scheme, and course of conduct which was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Anaplan securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Anaplan shares at artificially inflated prices. In furtherance of this unlawful course of conduct, Defendants each took the actions set forth herein.

104.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce including (but not limited to) the mails and wires, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations and prospects.   In particular, as detailed above, Defendants made materially misleading statements about Anaplan's calculated billings growth, sales environment and personnel, deal cycles, and momentum while omitting material adverse information including, *inter alia*, (a) that then-existing widespread problems within Anaplan's sales force, including leadership disputes, excessive turnover, and unrealistic quotas and extreme sales pressure threatened Anaplan's sales momentum and ability to retain necessary sales talent; (b) known "morale" problems; (c) that Anaplan's billings growth was then slowing and/or not tracking Anaplan's revenue growth; and (d) Anaplan inflated its projected billings growth by pressuring sales representatives to inflate the probability that a potential sale would close within the given period, and to mark such potential sales as "commits" when they did not qualify for the applicable criteria.

105.     Calderoni and Morton are liable both directly and indirectly for the wrongs complained of herein.  Because of their control and authority at Anaplan, Calderoni and Morton were able to and did control the content of Anaplan's statements.  Each had a duty as an officer, and Calderoni a duty as a director, of a publicly-traded company to disseminate timely, accurate, and truthful information to investors.

106.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal Anaplan's true condition from the investing public, and to support the artificially inflated prices of the Company's common stock.

107.     Plaintiff and Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Anaplan common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices paid, or at all, had they been aware that the market prices for Anaplan common stock had been artificially inflated by Defendants' fraudulent course of conduct.

108.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases of Anaplan stock during the Class Period.

109.     By reason of the conduct alleged herein, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**Violation of Section 20(a) of Securities Exchange Act of 1934**
**Against Individual Defendants**

110.     Plaintiff incorporates by reference and re-alleges each and every allegation above, as though fully set forth herein.

111.     Calderoni acted as a control person of Morton within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t, because Morton reported to Calderoni, and Calderoni had the ability to overrule Morton's day-to-day decisions.   Additionally, pursuant to Morton's employment agreement with Anaplan, Morton's bonus, if any, was solely "based on objective or subjective criteria established by the Company's Chief Executive Officer."  As a result, Calderoni had the power to

1   control or influence Morton's actions regarding Anaplan.

2       112.    Calderoni further acted as a control person of Anaplan within the meaning of Section

3   20(a) of the Exchange Act, 15 U.S.C. §78t, as alleged herein.  By his day-to-day micromanaging of

4   Anaplan's sales department; changes to the Company's sales plans; meetings with below-quota sales

5   teams; execution of his Sarbanes-Oxley certification in the Form 10-Q filed December 9, 2019;

6   participation as a representative of Anaplan during the Company's earnings conference calls and on

7   televised financial programs; and role as Anaplan's Chairman of the Board of Directors and Chief

8   Executive Officer; Calderoni had the power to influence and control, and did influence and control,

9   directly or indirectly, Anaplan's false and misleading statements alleged herein.

10      113.    Morton acted as a control person of Anaplan within the meaning of Section 20(a) of

11  the Exchange Act, 15 U.S.C. §78t, as alleged herein. By his personal involvement with Anaplan's

12  sales department; execution of his Sarbanes-Oxley certification in the Form 10-Q filed December 9,

13  2019; participation as a representative of Anaplan during the Company's earnings conference calls

14  and at industry conferences; and roles as Anaplan's Executive Vice President and Chief Financial

15  Officer; Morton had the power to influence and control, and did influence and control, directly or

16  indirectly, Anaplan's false and misleading statements alleged herein.

17      114.    Calderoni and Morton either: (a) personally made or (b) were provided with or had

18  unlimited access to copies of the statements alleged to be misleading prior to and/or shortly after those

19  statements were issued and had the ability to prevent the issuance of those statements or cause those

20  statements to be corrected.

21      115.    By virtue of these facts, Calderoni has violated Section 20(a) of the Exchange Act and

22  is liable to Plaintiff and the other members of the Class for the violations of the Section 10(b) of the

23  Exchange Act by Anaplan and Morton.

24      116.    By virtue of these facts, Morton has violated Section 20(a) of the Exchange Act and is

25  liable to Plaintiff and the other members of the Class for Anaplan's violations of the Section 10(b) of

26  the Exchange Act.

27

28

1

## PRAYER FOR RELIEF

2      WHEREFORE, Plaintiff demands judgment in favor of Plaintiff and the Class, and against

3  Defendants as follows:

4      A.      Determining that this action is properly maintainable as a class action pursuant to

5              Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class

6              Representative and Plaintiff's counsel as Class Counsel;

7      B.      Awarding compensatory damages in favor of Plaintiff and the Class against all

8              Defendants, jointly and severally, for all damages sustained as a result of Defendants'

9              wrongdoing, in an amount to be proven at trial, including interest thereon;

10     C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

11             action, including attorneys' fees and expert witness fees; and

12     D.      Awarding such extraordinary, equitable, injunctive and further relief as this Court

13             may deem just and proper.

14

## DEMAND FOR JURY TRIAL

15     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class demand

16  a trial by jury.

17      Dated: January 6, 2021                        Respectfully submitted,

18                                                    **POMERANTZ LLP**

19                                          By:       */s/ Joshua B. Silverman*
                                                      Patrick V. Dahlstrom (*pro hac vice*)
20                                                    Joshua B. Silverman (*pro hac vice*)
                                                      Jared M. Schneider (*pro hac vice*)
21                                                    10 S. LaSalle St., Suite 3505
22                                                    Chicago, Illinois 60603
                                                      Telephone: (312) 377-1181
23                                                    pdahlstrom@pomlaw.com
                                                      jbsilverman@pomlaw.com
24                                                    jschneider@pomlaw.com

25                                                    Jordan L. Lurie (SBN 130013)
26                                                    Ari Y. Basser (SBN 272618)
                                                      1100 Glendon Avenue, 15th Floor
27                                                    Los Angeles, California 90024
                                                      Telephone: (310) 432-8492
28                                                    jllurie@pomlaw.com

abasser@pomlaw.com

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

*Counsel for Lead Plaintiff Fadel Sakkal*