Jordan L. Lurie (SBN 130013)
Ari Y. Basser (SBN 272618)
POMERANTZ LLP
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 432-8492
jllurie@pomlaw.com
abasser@pomlaw.com
*Counsel for Lead Plaintiff Fadel Sakkal*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| FADEL SAKKAL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ANAPLAN INC., FRANK CALDERONI, and DAVID H. MORTON,<br><br>Defendants. | Case No. 3:20-cv-05959-RS<br><br><u>CLASS ACTION</u><br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>The Honorable Richard Seeborg<br><br>Date: August 26, 2021<br><br>Time: 1:30 PM<br><br>Courtroom: 3 |

**TABLE OF CONTENTS**

**Table of Contents** ......................................................................................................... i

**Table of Authorities** .................................................................................................. iii

**Statement of Issues to be Decided** .............................................................................1

**Introduction** .................................................................................................................1

**Facts Alleged** ................................................................................................................2

    A.    Anaplan's Connected Planning Software .........................................................3

    B.    Anaplan and Analysts Acknowledge Billings Provide Clearer Growth Picture............3

    C.    Internal Knowledge of Widespread Problems Threatening Sales Momentum..............4

    D.    Defendants' Misstatements During the Class Period.......................................6

        1.    The November 21, 2019 Earnings Call.............................................6

        2.    The December 9, 2019 Form 10-Q ...................................................7

        3.    The December 11, 2019 Barclays Conference .................................7

        4.    The December 13, 2019 *Mad Money* Appearance............................7

    E.    The Risks Materialize Just After Insiders Sell $24 Million in Anaplan Stock.............8

**Argument** ......................................................................................................................9

    I.    The Complaint Adequately Alleges that Defendants Violated §10(b) of the Exchange Act......................................................................................................9

        A.    Applicable Pleading Standards Do Not Favor Dismissal .................................9

        B.    Defendants' Omissions of Known Risks Rendered Their Statements Misleading............................................................................................10

        C.    Defendants' Concealed Risks to Billings Momentum Were Highly Material...............................................................................................14

        D.    Defendants' Concealment of Present Information is Not Shielded By the PSLRA's Limited Safe Harbor for Forward-Looking Statements ..................16

        E.    The CW Reports are Reliable and Specific .......................................................18

        F.    The Complaint Pleads a Strong Inference of Scienter ...................................20

             1.    The Complaint Alleges a Cogent and Compelling Inference of Scienter ..................................................................................20

2.    Defendants Offer No Plausible Competing Inference ........................24

II.    The Complaint States Claims Against Calderoni and Morton Under §20(a) ..............25

**Conclusion** ..............................................................................................................................25

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                       **PAGES**

*Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030 (N.D. Cal. 2012) .............................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................................................9

*Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC,
    2018 U.S. Dist. LEXIS 200769 (N.D. Cal. Nov. 27, 2018)......................................................24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................................9

*Berson v. Applied Signal Tech. Inc.*, 527 F.3d 982 (9th Cir. 2008)........................................................16

*Bodry v. GoPro, Inc.*, 252 F. Supp. 3d 912 (N.D. Cal. 2017)................................................................17

*Boston Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361-RS,
    2020 U.S. Dist. LEXIS 141724 (N.D. Cal. Aug. 7, 2020)........................................................15

*Bricklayers & Masons Loc. Union No. 5 Ohio Pen. Fund v. Transocean Ltd.*,
    866 F. Supp. 2d 223 (S.D.N.Y. 2012)................................................................................14, 15

*Brodsky v. Yahoo!*, 630 F. Supp. 2d 1104 (N.D. Cal. 2009)...................................................................15

*Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096 (C.D. Cal. 2012)...............................20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ..........................................................................................13, 23

*City of Royal Oak v. Juniper Nets., Inc.*, 880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..............................22

*City of Sunrise Firefighters' Pen. Fund v. Oracle Corp.*, No. 18-cv-04844-BLF,
    2019 U.S. Dist. LEXIS 216801 (N.D. Cal. Dec. 17, 2019)................................................19, 22

*Cunha v. Hansen Natural Corp.*, No. EDCV 08-1249-GW (JCx),
    2012 U.S. Dist. LEXIS 191744 (C.D. Cal. Oct. 22, 2012).......................................................10

*Dura Pharms, Inc. v. Broudo*, 544 U.S. 336 (2005)...........................................................................10

*Evanston Police Pen. Fund v. McKesson Corp.*, 411 F. Supp. 3d 580 (N.D. Cal. 2019).............21, 22

*Glazer Capital Management, LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008) .......................................21

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983) .........................................................20

*In re Accuray Sec. Litig.*, 757 F. Supp. 2d 936 (N.D. Cal. 2010).......................................................22

---

*In re Apple Sec. Litig.*, No. 19-cv-02033-YGR,
2020 U.S. Dist. LEXIS 96953 (N.D. Cal. June 2, 2020) ("*Apple I*") ..............................10, 13

*In re Apple Sec. Litig.*, No. 19-cv-02033-YGR,
2020 U.S. Dist. LEXIS 206298 (N.D. Cal. Nov. 4, 2020) ("*Apple II*") ......................10, 24, 25

*In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833 (N.D. Cal. 2000)................................................22

*In re Bridgepoint Educ. Inc. Secs. Litig.*, No. 12-1737,
2013 U.S. Dist. LEXIS 131423 (S.D. Cal. Sep. 13, 2013) ...................................................24

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................16, 17, 18

*In re Cutera Sec. Litig.*, 610 F.3d 1103 (9th Cir. 2010)....................................................................15, 17

*In re Downey Secs. Litig.*, No. CV 08-3261-JFW(RZX),
2009 U.S. Dist. LEXIS 83443 (C.D. Cal. Aug. 21, 2009).......................................................23

*In re Fusion-io, Inc. Sec. Litig.*, No. 13-CV-05368-LHK,
2015 U.S. Dist. LEXIS 18304 (N.D. Cal. Feb. 12, 2015) .........................................................12

*In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145 (D. Or. 2015)............................23, 24

*In re IAC/Interactivecorp Secs. Litig.*, 695 F. Supp. 2d 109 (S.D.N.Y. 2010) ....................................12

*In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005) ....................................9, 11

*In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107 (N.D. Cal. 2017) .............................................10

*In re Rackable Sys.*, No. C 09-0222 CW,
2010 U.S. Dist. LEXIS 88927 (N.D. Cal. Aug. 27, 2010).......................................................13

*In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242 (N.D. Cal. 2019).........................15

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) ............................................. *passim*

*In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972 (N.D. Cal. 2017)..............................................15

*In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086 (N.D. Cal. 1994).....................................................12

*In re Versant Object Technology Corp. Securities Litigation*, No. C 98-00299 CW,
2000 U.S. Dist. LEXIS 22333 (N.D. Cal. May 18, 2000) .......................................................15

*In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334 (M.D. Fla. 2007)............................12

*Kane v. Madge Nets. N.V.*, No. C-96-20652-RMW,
2000 U.S. Dist. LEXIS 19984 (N.D. Cal. May 25, 2000) .......................................................12

*Kapur v. USANA Health Sciences., Inc.*, No. 2:07-CV-00177DAK,
    2008 U.S. Dist. LEXIS 58955 (D. Utah July 23, 2008) ..........................................................17

*Karam v. Corinthian Colls., Inc.*, No. CV 10-6523-GHK,
    2012 U.S. Dist. LEXIS 188594 (C.D. Cal. Aug. 20, 2012)....................................................15

*Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF,
    2020 U.S. Dist. LEXIS 10721 (C.D. Cal. Jan. 17, 2020) ........................................................23

*Karinski v. Stamps.com, Inc.*, 472 F. Supp. 3d 747 (C.D. Cal. 2020) ...................................................13

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)......................................... *passim*

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) .............................................................9, 25

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008)..................................22

*Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB,
    2017 U.S. Dist. LEXIS 99431 (D. Or. June 27, 2017) ..........................................................10

*Nursing Home Pen. Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) ................21, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*, 575 U.S. 175 (2015) ...............13

*Paciga v. Invuity Inc.*, No. C 17-01005 JSW,
    2018 WL 7286503 (N.D. Cal. Sept. 26, 2018) ......................................................................15

*Paciga v. Invuity Inc.*, No. C 17-01005 JSW,
    2019 U.S. Dist. LEXIS 135820 (N.D. Cal. Aug. 12, 2019)....................................................19

*Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014)....................................15, 22

*Reidinger v. Zendesk, Inc.*, No. 19-cv-06968-CRB,
    2020 U.S. Dist. LEXIS 209548 (N.D. Cal. Nov. 9, 2020)......................................................21

*Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041 (N.D. Cal. 2018)...................................................17

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)................................................................................17

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001)..........................................................................23, 24

*Sanders v. RealReal, Inc.*, No. 19-cv-07737-EJD,
    2021 U.S. Dist. LEXIS 64386 (N.D. Cal. Mar. 31, 2021)................................................14, 18

*Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016).............................................10, 25

*Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017)......................................................23

*Shurkin v. Golden State Vintners, Inc.*, 471 F. Supp. 2d 998 (N.D. Cal. 2006) ...................................19

*Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019)...................................................................................12

*S. Ferry LP v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ......................................................................20, 21

*Sparling v. Daou (In re Daou Sys.)*, 411 F.3d 1006 (9th Cir. 2005) .......................................................18

*Tarapara v. K12 Inc.*, No. 16-cv-4069-PJH,
      2017 U.S. Dist. LEXIS 140037 (C.D. Cal. Aug. 30, 2017)........................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ......................................9, 10, 20, 22

*Wochos v. Tesla*, 985 F.3d 1180 (9th Cir. 2021) ....................................................................................16

*Wozniak v. Align Technology, Inc.*, 850 F. Supp. 2d 1029 (N.D. Cal. 2012) ........................................22

*Yanek v. STAAR Surgical Co.*, 388 F. Supp. 2d 1110 (C.D. Cal. 2005) ................................................17

*Zaghian v. Farrell*, 675 F. App'x 718 (9th Cir. 2017) .......................................................................17, 25

*Ziebron v. Metaldyne Corp.*, No. 09-10164,
      2010 U.S. Dist. LEXIS 102888 (E.D. Mich. Sept. 28, 2010)....................................................12

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ...................................19, 22, 23

**STATUTES**

Private Securities Litigation Reform Act of 1995 ...............................................................................9, 10

15 U.S.C. §78j.................................................................................................................................1, 9, 10, 25

15 U.S.C. §78t......................................................................................................................................1, 25

15 U.S.C. §78u-4 ......................................................................................................................................10

**RULES**

17 C.F.R. §240.10b-5..........................................................................................................................10, 25

17 C.F.R. §240.10b5-1................................................................................................................................24

Fed. R. Civ. P. 8..........................................................................................................................................9

Fed. R. Civ. P. 9..........................................................................................................................................9

**SECONDARY SOURCES**

David F. Larcker et al., *Gaming the System: Three "Red Flags" of Potential 10b5-1 Abuse*, Stanford
      Corp. Governance Research Initiative, *available at*:
      https://www.gsb.stanford.edu/sites/default/files/publication-pdf/cgri-closer-look-88-gaming-
      the-system.pdf (Jan. 19, 2021)...................................................................................................24

Lead Plaintiff Fadel Sakkal ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion to dismiss filed by Defendants Anaplan, Inc. ("Anaplan" or the "Company"), Frank Calderoni, and David H. Morton (collectively, "Defendants").

### STATEMENT OF ISSUES TO BE DECIDED

1.     The Exchange Act's prohibition on misleading statements requires companies and insiders touting positive material information to disclose adverse material information that cuts against the positive. Defendants touted Anaplan's Billings momentum, but concealed known risks threatening that momentum, including known problems within Anaplan's sales force, in response to questions from analysts. Did Defendants violate the Act's prohibition?

2.     Plaintiffs are required to plead a strong, holistic inference of scienter that is clear and cogent, and at least as compelling as any opposing inference. The Complaint alleges Defendants were aware of the risks to Billings momentum (a key metric) via their highly-sophisticated business-planning platform, direct reports from numerous witnesses, suspicious departures of sales leaders, and contemporaneous insider stock sales. Does the Complaint plead a strong inference of scienter?

3.     If a company violates §10(b) of the Exchange Act, §20(a) imposes control-person liability on its influences and controllers. Defendants concede that if the Complaint states a claim pursuant to §10(b), the §20(a) claim against Calderoni and Morton survives as well. If the Complaint states a claim under §10(b), does it also state a claim under §20(a)?

### INTRODUCTION

Defendants' superficial, broad-brush challenges to the Complaint's confidential witnesses ("CWs") and well-pleaded allegations of falsity and scienter collapse upon a fair examination of the Complaint. Unable to find deficiencies in the Complaint, the Brief instead glosses over detail and resorts to mischaracterization and references to extrinsic evidence in a shopworn attempt to dismiss.

This case is straightforward. Defendants' sole product, a highly-sophisticated business-planning platform, provides them and other executives with real-time, accurate, granular metrics and sales projections. ¶¶2, 24-27, 80, 83.[1] During an earnings call, Defendants reported Anaplan's highest

_____

[1] All "Br." references are to Defendants' Brief (ECF No. 38). All "¶__" references are to the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF. No. 36).

Pl.'s Opp'n Defs.' Mot. Dismiss Am. Compl. – Case No. 20-cv-05959-RS          Page 1

growth as a public company, yet responded to analysts' questions about any risks threatening that growth with flat denials. ¶¶4-5, 7-9, 51-59, 70, 73.  Prior to then, however, several CWs from different ranks and geographies consistently reported blown sales commits and quotas, lengthening sales cycles yielding lower bookings, and excessive turnover at all levels of the sales force, including Anaplan's Chief Revenue and Global Customer Officers, the latter its "ultimate sales guy" and "guru." ¶¶36-50.

Anaplan acknowledged the importance of its "Billings" metric (the sum of its quarterly revenue and quarterly change in "deferred" revenue) to the Company's value, and consistently highlighted both current Billings and comparisons with prior Billings. ¶¶3, 4, 33, 53, 70, 73, 75, 80. Analysts were also laser-focused on this one metric. ¶¶4, 8, 9, 32, 73, 76, 77. Venture capitalists similarly called it "[a] good proxy to measure the growth – and ultimately the health – of a SaaS company."  ¶¶28, 30, 31.

During a November 21, 2019 earnings call, Defendants' touted Anaplan's exceptional 59% year-over-year Billings growth as a product of impressive leadership and confirmed Anaplan's "billings to track in line" with revenue, causing the stock to soar.  ¶¶51, 53, 60.  In response to analysts' pleas for more details, Defendants denied the presence of any "tweaks" to the sales organization, "deferred patterns," or "macro concerns," notwithstanding their knowledge of the many serious risks threatening Anaplan's Billings momentum and sales force, denials Morton and Calderoni reiterated separately at the Barclays Conference and on Jim Cramer's *Mad Money*. ¶¶54, 56, 58, 70, 73.

Defendants' undisclosed risks materialized on February 27, 2020, soon after they sold millions of dollars of personal holdings in Anaplan stock at inflated prices.  ¶¶75, 85-87.  During their next Earnings Call, Defendants disclosed that Anaplan's Billings for its most-important fourth quarter had only grown 25%, a little more than half of its 46% revenue growth.  ¶75.  Defendants blamed the miss on "lower-than-anticipated growth in billings" and "management changes," including the resignation of recently-hired Mark Anderson.  *Id.*  Analysts, however, saw right through Calderoni's excuse that Anderson was "spend[ing] more time with his family," noting that it "hints at deeper issues."  ¶77. On the news, Anaplan's stock plummeted 25% with volume exceeding its IPO day by 125%.  ¶78.

## FACTS ALLEGED

The Brief omits any discussion of well-pleaded allegations documenting the substantial risks jeopardizing Anaplan's Billings momentum, ignores Defendants' conceded "accurate, real-time"

insight into Anaplan's Billings, and miscasts their fraud as a failure to predict the future.  Br. 3-6; ¶¶27, 83.  A fair review of the actual allegations establishes Defendants' liability for touting Anaplan's Billings momentum while concealing known risks imperiling it.

### A.    Anaplan's Connected Planning Platform

Anaplan is a software-as-a-service ("SaaS") company that pioneers "Connected Planning," a software platform (the "Platform") that provides integrated planning functions across an organization. ¶¶2, 24.  Connected Planning, according to the Company, "fundamentally transform[s] planning by connecting all of the people, data, and plans needed to accelerate business value and enable real-time planning and decision-making in rapidly changing business environments."  ¶¶2, 24, 25.  The Company claims further that its novel planning platform "plac[es] the power of planning in the hands of every individual at every level within and between organizations."  ¶25.

Among the many uses for its Platform, Anaplan emphasizes that its "Sales Forecasting" module enables fast, hypergranular, "reliable and dynamic" real-time forecasts that align with planning models and metrics, "update[able] on the fly based on current market conditions" by sales leaders. ¶¶26, 27, 83.  Anaplan specifically addresses tracking and forecasting quota attainment and relief, and solves the problem of "limited visibility into pipeline health" by leveraging "third-party data" and "historical sales patterns, ***including trend and seasonality***, to create more accurate forecasts that represent the present selling environment."  ¶¶27, 83 (emphasis added).  Anaplan also touts its "accurate, real-time forecast creation" as a solution to "forecasting delays." ¶¶27, 83.  Unsurprisingly, Morton told investors and analysts at the Barclays Conference that Anaplan "drink[s] [its] own champagne," *i.e.,* uses the Platform to forecast its own sales, including its bookings and Billings.  ¶83.

### B.    Anaplan and Analysts Acknowledge Billings Provide Clearer Growth Picture

Anaplan offers its Platform as a subscription service. ¶28.  Like most, if not all SaaS companies, generally-accepted accounting principles created a misalignment between the immediate recognition of Anaplan's costs to acquire a customer and the gradual recognition of its revenue derived from that customer. ¶¶29-31.  As a result, Anaplan and the market generally tracked "Billings."  ¶¶30, 31.  According to venture capitalists, Billings is more meaningful than revenue because "a SaaS company could show stable revenue for a long time (just by working off its billings backlog) which

could make the business seem healthier than it truly is." ¶31. This point was not lost on Anaplan's analysts, who focused on the Company's three straight quarters of "[m]id-40%s subscription growth" as "alleviat[ing] initial sales execution concerns," further "validation of strong sales trends," and "indicat[ive] of continued positive business outcome." ¶¶32, 73. Anaplan likewise told investors that the components of its Billings were "key metrics" and compared its year-over-year quarterly Billings in each earnings call. ¶¶33, 34, 53, 75.

C.    **Internal Knowledge of Widespread Problems Threatening Sales Momentum**

Anaplan's Regional Vice President of Sales (CW5) and one of its Strategic Account Executives (CW8) both agreed that extreme pressure and expectations were coming from Anaplan's leadership. ¶¶41, 42. CW7, another Strategic Account Executive, observed his supervisor, Deb Kennedy, altering her subordinates' sales forecasts to inflate closing expectations so that even deals with only a 50% chance of closing would be forecasted to close by the end of the quarter. ¶40. CW6 (Enterprise Account Executive) and CW8 both agreed with CW7 that because there were not enough deals in the pipeline to meet quota, they would be pressured to "commit" a higher percentage, rather than providing accurate assessments of their potential deals. ¶¶41, 42. This, as CW7 observed, led to a lot of pipeline exaggeration and distortion, which caused "commits" to close later and at lower booking amounts (*i.e*, the contract's total amount), likely due to scrambles to close business. ¶¶42, 45. As an example, CW7 reported a deal with a large video game developer that had been forecast to close in the fourth quarter; it eventually closed the following quarter for 30% of its projected booking. ¶45. Anaplan's pipeline exaggeration and distortion was apparent throughout the organization, as three members of Anaplan's sales' team, CW5, CW6, and CW7 consistently reported that, in contrast to the 50% attainment at CW7's previous employment, only 10-20% of Anaplan's sales force met their quotas. ¶38.

Anaplan's blown quotas, pipeline distortions, lower bookings, and excessive turnover were well known to Defendants. ¶¶1, 10-12, 26-27, 35-38, 40-50. Aside from information garnered through its Connected Planning Platform, Anaplan's former employees reported Calderoni's and Morton's receipt of internal monthly, quarterly, and annual sales reports related to quota attainment, actual and projected Billings, bookings, and "backlog" (uninvoiced, unearned revenue expected to be earned in the future). ¶¶34, 35, 43, 44. CW7 reported that Anaplan's sales supervisors ran the Company's sales

forecasting model each week and reported it to Anaplan's leadership. ¶43. Corroborating CW7's account, Anaplan's Vice President of Financial Planning and Analysis (CW2) explained how Calderoni was so fixated on these Billings projections that he directly involved himself with sales teams whenever the projections were below quota. ¶43. Moreover, CW3, a senior revenue accountant, reported to Morton each month the Company's bookings, Billings, backlog, all current-month invoices, month-over-month Billings comparisons, assessed Billings, and variances. ¶35.

Defendants' actual knowledge of the sales problems was also confirmed by confidential witnesses, who described angry reactions at sales meetings. ¶36. According to Anaplan's former Chief Revenue Officer (CW1), Calderoni's veins would pop out of his neck during chaotic expletive-filled meetings with sales leadership. *Id.* Outside of meetings, both CW1 and CW4 recalled Calderoni and Morton's micromanagement of the day-to-day of the sales department, overruling its leadership and erratically changing plans every few days. ¶¶36, 37. Calderoni later admitted Anaplan's "big morale problem" to CW4 during a pre-Class Period job interview, asking CW4 to fix it. ¶37.

As numerous CWs detailed, Defendants' extreme sales pressure, unrealistic quotas, and fallout from blown commits took their toll on Anaplan's sales department leading up to the Class Period. ¶¶10-11, 46-50. CW6 reported that despite abundant hiring, sales managers were under tremendous pressure to fire recent hires that could not meet Defendants' excessive quotas. ¶46. In connection with this "hire fast and fire faster" policy, CW6 observed an extremely high turnover rate at all levels of Anaplan's sales department, from salespeople and regional vice presidents to executives. ¶46. CW4 was present at the end to watch Defendants' tough, hostile culture drive out their best in sales and marketing, including the Company's heads of customer relations, analyst relations in marketing, field marketing, and its Global Customer Officer, Paul Melchiorre, whom, according to CW9's and CW10's customers, was Anaplan's "ultimate sales guy" that the Company's customers and "true believers" held up as a "guru" of Anaplan's platform. ¶47. CW1 abandoned millions of options just to get away from Defendants' toxic environment. ¶36. Guru Melchiorre left in September 2019. ¶47. Numerous Glassdoor.com reports from former employees corroborate the above accounts. ¶50.

Another casualty of Anaplan's poisonous culture was Mark Anderson, former President and Chief Revenue Officer of Palo Alto, whose "talent and breadth of knowledge . . .as a visionary growth

leader" with "deep experience driving sustained growth and scale, and . . . [a] passion for building exceptional teams" was lauded by Calderoni. ¶48. Internally, however, Calderoni quickly clashed with Anderson and regularly interfered with his efforts to improve Anaplan's sales operation and growth. ¶49. Anderson, the "rock star sales guy," lasted less than half a year before suspiciously leaving Anaplan "to spend more time with his family." ¶¶48, 75.

D.    **Defendants' Misstatements During the Class Period**

1.    **The November 21, 2019 Earnings Call**

At Anaplan's earnings call on November 21, 2019, the Company posted an impressive 44% quarterly revenue growth, and then shocked analysts by announcing Billings growth of 59%, a "big beat" that was its "highest growth since going public." ¶¶51, 53, 60. Calderoni proclaimed that Anaplan had "a lot more momentum ahead," while Morton confirmed Anaplan's "billings to track in line with overall revenue growth rates." ¶¶51, 53. Analysts probed deeper, asking for more details about any "deferred patterns" or "macro concerns" to worry about. ¶¶54, 58. Despite knowing about the blown quotas and chaotic sales environment leading to excessive turnover and lower bookings, then threatening momentum, Defendants again described calm waters. ¶¶1, 10-12, 36-38, 40-50, 54, 58. Per Morton, Anaplan's sales momentum "would continue on at the rate and pace . . . of the preliminary guidance we gave for next fiscal year" while Calderoni denied "any changes in the macro environment or within deal cycles," emphasizing "nothing we've observed more recently." ¶¶54, 58.

Similarly, in discussing the Company's "consistent topline growth," Defendants praised the Company's "impressive leaders and innovative talent, who will continue to elevate us further." ¶51. When analysts pointedly asked how this elevation would occur, Calderoni stressed Anderson's experience with "companies going through rapid growth," and represented that "Mark is even helping us now kind of go to that next level," to continue Anaplan's "process, . . . productivity, . . . [and] connection with some of these large experienced partners that we have." ¶56. When an analyst later asked Calderoni if he was changing or "tweak[ing]" Anderson and Anaplan's sales organization, he again responded that Anderson was "helping the team that we've developed over the last couple of years, move up to that next level." ¶58. Investors reacted positively to the Company's confirmation of its growth trajectory and the clear path ahead, sending the share price up 8% to close at $53.09. ¶60.

But these statements, too, were misleading. ¶¶10, 52, 57, 59. Anaplan and Calderoni omitted crucial known, then-existing issues with the sales team, including leadership in-fighting and power struggles between Anderson and Calderoni and Morton; perpetually-inexperienced sales people due to internally-driven excessive turnover; and unrealistic quotas, with resulting weak commits causing the Company's deals to be smaller and pushed out to later quarters, if at all. ¶¶11-12, 36-50.

### 2. The December 9, 2019 Form 10-Q

In the "scaling our sales team" section of Anaplan's Form 10-Q filed December 9, 2019, Defendants told investors that "[w]e are continually hiring significant numbers of sales personnel and our ability to increase our revenue will depend on the new members of our sales force becoming fully productive." ¶65. In reality, however, Defendants were firing sales personnel faster than Anaplan could hire them, impeding sales productivity. ¶¶46-50, 66.

### 3. The December 11, 2019 Barclays Conference

On December 11, 2019, Morton spoke at the Barclays Global Technology, Media and Telecommunications Conference. ¶¶8, 69. At the conference, the moderator asked Morton to explain Anaplan's "acceleration of growth" in contrast to the deceleration experienced with "normal IPO[s]," because it appeared to be "still the normal standard of blocking and tackling." ¶70. Although aware of them, Morton did not warn the public of risks to Anaplan's then-accelerating Billings momentum, including excessive turnover due to the Company's "hire fast and fire faster" policy, blown quotas, chaotic sales environment, and executive infighting, (¶¶11-12, 36-50, 71), instead confirming that Anaplan's "pretty straightforward" growth story resulted from hiring experienced executives. ¶70.

### 4. The December 13, 2019 *Mad Money* Appearance

On December 13, 2019, Calderoni sat for an interview with Jim Cramer on CNBC's *Mad Money*. ¶¶9, 72. During the interview, Cramer emphasized the "billings accelerator" as "really important" and asked Calderoni, "Frank, how does someone go from 46% to 59% acceleration?" ¶73. Calderoni supplied the slick response that "I think it's kind of the space we're in. . . . SaaS companies in total, the whole digitization is really starting to accelerate." ¶73. But Calderoni was not honest about the risks threatening Anaplan's growth trajectory, such as blown quotas, Defendants' frenetic sales-strategy changes, or the excessive turnover affecting all of Anaplan's sales team. ¶¶36-50, 74.

**E.       The Risks Materialize Just After Insiders Sell $24 Million in Anaplan Stock**

Defendants Calderoni and Morton sold suspicious amounts of stock throughout the Class Period. ¶¶85-87.  Prior to the Class Period, Calderoni regularly sold 30,000 shares of Anaplan on or around the tenth of the month.  ¶86. After Defendants artificially inflated Anaplan's stock price, Calderoni ramped his regular monthly sales by 150% and began selling shares outside his normal window.  In particular, Calderoni sold 40,800 shares *on the day of* the allegedly-misleading November 21 Earnings Call, and another 15,000 on January 2 and 3, 2020. ¶86. Moreover, on February 3 and 4, 2020, just weeks before the truth was revealed to the market, Calderoni sold 93,596 shares, realizing over $5.7 million from those two days alone. ¶86.  Additionally, Morton sold 25,000 shares of Anaplan stock on December 20, 2019, enjoying proceeds of $1,325,017.50.  Contemporaneous with Morton's sale, Rob Ward, a member of Anaplan's Board of Directors and its Audit Committee, also sold 219,197 shares of Anaplan stock, receiving $11,620,117.59.[2]

Risks to Anaplan's Billings momentum materialized on February 27, 2020.  ¶¶13, 75.  During the earnings call for Anaplan's fiscal fourth quarter of 2020, Defendants disclosed that Billings for the Company's crucial fourth quarter had grown only 25% from the previous year's quarter—a major drop from its 42% revenue growth over the comparable period, well below consensus estimates, and roughly half of the Company's historical growth of 46% to 59%. *Id*.  Morton blamed the miss on "management changes" that "affected alignment around some key near-term opportunities, . . . resulting in a lower-than-anticipated growth in billings." *Id*.  Meanwhile, Calderoni announced that Anderson, Anaplan's "rock star" Chief Growth Officer was "step[ing] back from his full-time role to spend more time with his family." ¶¶13, 48, 75.  Analysts immediately seized upon Defendants' bogus excuse for Anderson's departure and the lack of commentary surrounding Anaplan's latest Billings miss. ¶¶76-77.  RBC wrote that Calderoni's statement "diverge[d]" with its "checks . . . suggesting that Mark Anderson's departure came after a difference of opinion with the CEO," while Barclays noted that, given Anderson's "recent[] hiring," his departure "hints at deeper issues." ¶77.  Wells Fargo

---

[2] This was erroneously written in the Complaint as $3,896,030.  *See* ¶87; Form 4 of Rob Ward, *available at*: https://www.sec.gov/Archives/edgar/data/0001540755/000120919119061998/xslF345X03/doc4.xml.

wrote that Anaplan's "billings growth [was] well below expectations, and RBC expected as a result of these disclosures that shares would "underperform in the interim," expressing concern, in part, regarding the "departure of a well-respected and talented leader, . . ." ¶¶76-77. As a result, Anaplan's stock price dropped 25%, falling from $58.09 to $44.04 on record-setting volume. ¶78.

## ARGUMENT

I.      **The Complaint Adequately Alleges that Defendants Violated §10(b) of the Exchange Act**

      A.      **Applicable Pleading Standards Do Not Favor Dismissal**

To state a claim under §10(b), Plaintiff must allege "(1) a material misrepresentation or omission by the defendants; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants concede that most elements of Plaintiff's §10(b) claim are adequately pled, and their challenges as to the remaining "misrepresentation or omission" and "scienter" elements fail.

A motion to dismiss is not the time to engage in fact finding or weigh evidence outside the pleadings. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1015 (S.D. Cal. 2005). For purposes of a "Rule 12(b)(6) motion to dismiss a §10(b) action, courts must . . . accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *accord In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). A request for relief need only be "plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). But "[t]he plausibility standard is not akin to a "probability requirement," just "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility is satisfied where, as here, a plaintiff "plead[s] factual content that allows the court to draw the reasonable inference that the defendant is liable." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). While the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule of Civil Procedure 9(b) require more detailed pleading than Rule 8 for certain claim elements, they do not elevate pleading burdens to the extent suggested by Defendants. Particularity simply requires that securities litigation plaintiffs plead the "who, what, when, where and how" details of Defendants' misrepresentations and omissions. *Khoja*, 899 F.3d at 1008.

Similarly, though the PSLRA requires that a plaintiff allege facts supporting a strong inference of scienter, *see* 15 U.S.C. §78u-4(b)(2), the inference need not be "irrefutable, i.e., of the 'smoking gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Instead, a complaint alleges a strong inference of scienter so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *See In re Apple Sec. Litig.*, No. 19-cv-02033-YGR, 2020 U.S. Dist. LEXIS 206298, *39 (N.D. Cal. Nov. 4, 2020) (citing *Tellabs*, 551 U.S. at 323-24) ("*Apple II*").

### B. Defendants' Omissions of Known Risks Rendered Their Statements Misleading

The Securities Exchange Act of 1934 (the "Exchange Act") prohibits the omission "of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting 17 C.F.R. §240.10b-5(b)). Here, Anaplan, Calderoni, and Morton each violated §10(b) of the Exchange Act by "choos[ing] to tout positive information to the market" about Anaplan's Billings momentum, while failing "to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1008-09 (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016)).

While "'general positive statements'" do not necessarily create disclosure obligations, where, as here, "a party goes beyond describing historical results and touts specific factors driving those results [*see* ¶¶51, 53, 54, 56, 58, 65, 67, 70, 73], it is obligated to disclose negative information related to those factors." *In re Apple Sec. Litig.*, No. 19-cv-02033-YGR, 2020 U.S. Dist. LEXIS 96953, at *30-31 (N.D. Cal. June 2, 2020) ("*Apple I*") (touting "high upgrade rates" required disclosure that upgrades were due to recent software update that "throttled" old phones); *see also In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (touting organic growth required disclosure that some growth stemmed from self-dealing); *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2017 U.S. Dist. LEXIS 99431, at *26 (D. Or. June 27, 2017) (finding claim of sustained organic growth required disclosure that growth was achieved by unsustainable sales tactics); *Cunha v. Hansen Natural Corp.*, No. EDCV 08-1249-GW (JCx), 2012 U.S. Dist. LEXIS 191744, at *3 (C.D. Cal. Oct. 22, 2012) (finding duty to disclose revenue was driven by "channel-stuffing").

Defendants do not specifically challenge that most of their alleged misstatements presented investors and analysts with a misleading view of the material risks facing Anaplan's all-important Billings momentum.  Defendants also do not dispute that the Complaint alleges the "who, what, when, where" of each misstatement and omission, and ignore almost all of the allegations explaining "why" each was materially false and/or misleading.  At bottom, Defendants only attempt to challenge parts of three of the many misstatements alleged in the Complaint. Their assertions, however, merely contest "[w]hether a statement is misleading" or "whether adverse facts are adequately disclosed," which "are generally questions that should be left to the trier of fact." *Immune Response*, 375 F. Supp. 2d at 1017.  As detailed below, each challenge fails.

Defendants' challenges to (1) Morton's Billings statement (¶53, Br. 8) and (2) Calderoni's denial of "any changes in the macro environment or within deal cycles" (¶58, Br. 8) lack merit. Defendants' discussion of only one allegation of falsity ("the growth of Anaplan's Billings was then slowing," Br. 8), ignores the rest of the Complaint, which alleges in detail that these statements were misleading because of Defendants' failure to disclose risks to Anaplan's increasing Billings momentum, including blown sales commits and quotas; lengthening sales cycles and lower Billings; executive infighting; and excessive turnover at all levels of the sales team, including sales guru Paul Melchiorre and CW1, exacerbated by the Company's "hire fast and fire faster policy."  ¶¶36-50, 55, 59.  Moreover, the Complaint *does* allege a reasonable inference that Anaplan's Billings was slowing, as the Complaint alleges that only 10-20% of Anaplan's sales team met their quotas, Calderoni met with sales teams that had below-quota sales projections, and deals were closing in later quarters and in lower booking amounts.  ¶¶38, 42, 43, 45.

Regarding their Form 10-Q, Defendants incorrectly claim (Br. 13) that Plaintiff is required to contradict statements that Anaplan's was "continually hiring significant numbers of sales personnel and our ability to increase our revenue will depend on the new members of our sales force becoming fully productive." (¶65, Br. 13).  Defendants misstate the pleading obligation.  Plaintiffs have plausibly alleged why these statements are misleading, which is all that is required.  *Khoja*, 899 F.3d at 1008-09.  As the Complaint makes clear, these statements created the false impression of a growing, productive sales force. ¶¶66, 68.  In fact, Defendants were firing sales personnel faster than they were

hiring them.  ¶¶11, 46, 68.  Due to this policy, and combined with Anaplan's other problems, its perennially-new salesforce would never "becom[e] fully productive." ¶¶36-50, 66.  That is sufficient.

Defendants improperly rely on a number of cases citing the unremarkable proposition that "fraud by hindsight is not actionable."  *See* Br. 9-10.  But in contrast to Plaintiff's many detailed descriptions of Anaplan's sales environment as it existed immediately prior to the Class Period, (*see* Facts Alleged §C), the *Fusion-io* and *Syntex* plaintiffs merely "allege[d] that because subsequent facts allegedly undermined the statements of [the defendants] during the Class Period, those statements were false."  *In re Fusion-io, Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 18304, *60 (N.D. Cal. Feb. 12, 2015); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1094 (N.D. Cal. 1994) ("Plaintiffs' allegations are based on internal memoranda dated at least three months after the announcement was made.").

Defendants' other superficial citations to cases regarding affirmative disclosure duties are similarly without force.  *See* Br. 13-14.  In contrast to statements in public documents at issue in *Singh* and *IAC*, Defendants here misleadingly concealed risks to Anaplan's Billings momentum in response to pointed questions from analysts.  *Compare Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (rejecting claim arising out of "general declarations about the importance of acting lawfully and with integrity") *and In re IAC/Interactivecorp Secs. Litig.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010) (rejecting "[s]ketchy" allegations of mismanagement that failed to identify "any specific material consequence" of the mismanagement) *with* ¶¶54, 56, 58, 70, 73.  Moreover, the Complaint's specific connections between each misleading statement and the known omitted information (¶¶51-52, 53-55, 56-57, 58-59, 65-66, 67-68, 70-71, 73-74) stand in sharp contrast to the *Kane* complaint's lack of connection between the alleged omissions and "specific true statements that were rendered misleading because adverse information was omitted," *Kane v. Madge Nets. N.V.*, No. C-96-20652-RMW, 2000 U.S. Dist. LEXIS 19984, *30 (N.D. Cal. May 25, 2000).  Meanwhile, *Winn-Dixie* and *Metaldyne* only found that there is no affirmative duty of disclosure; neither case discussed whether, as here, Defendants' misleading responses created a duty of disclosure.  ¶¶10, 52, 55, 57, 59, 66, 68, 71, 74; *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1345 (M.D. Fla. 2007); *Ziebron v. Metaldyne Corp.*, No. 09-10164, 2010 U.S. Dist. LEXIS 102888, *11-12 (E.D. Mich. Sept. 28, 2010).

The Brief also attempts a scattershot of additional undeveloped, and legally wrong, arguments

attempting to characterize the statements as nonactionable.  Each misses the mark.  First, Defendants' references to Anaplan's "billings . . . fluctuat[ions]" or two quarters of growth in no way sanctions concealment of known risks to its Billings momentum.  *See* Br. 8, 12.  The case Defendants cite, *Rackable*, does not support this broad conclusion, instead finding only that a sales strategy's ultimate failure does not establish that the defendants knew the strategy would be unsuccessful at its implementation.  *In re Rackable Sys.*, No. C 09-0222 CW, 2010 U.S. Dist. LEXIS 88927, *15 (N.D. Cal. Aug. 27, 2010).  Here, by contrast, Defendants "cho[se] to tout positive data" related to Billings momentum, so they were required to, but did not "disclose additional 'adverse information that cuts against the positive information.'"  *Apple I*, 2020 U.S. Dist. LEXIS 96953 at *28-29 (quoting *Khoja*, 899 F.3d at 1009).

While this Court should "decline[] to analyze" arguments that "[D]efendants . . . did little more than to raise . . . in a footnote," each fails on the merits.  *See Tarapara v. K12 Inc.*, No. 16-cv-4069-PJH, 2017 U.S. Dist. LEXIS 140037 (C.D. Cal. Aug. 30, 2017).  Defendants' one-sentence argument that Morton's Billings misstatements are nonactionable statements of belief (Br. 15 n.13) fails.  It ignores (1) that a statement of fact is not rendered opinion merely because it is prefaced with "we believe," *see, e.g.*, *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*, 575 U.S. 175, 193 (2015); and (2) the many undisclosed facts alleged in the Complaint that "seriously [] undermine[d]" Morton's statement.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017); *see, e.g.*, ¶¶10, 36-37, 46-50, 55.  Similarly, "it is simply too much to argue . . . as a matter of law" an alternative interpretation of Morton's Billings-momentum statement (*see* Br. 10 n.8).  *See Karinski v. Stamps.com, Inc.*, 472 F. Supp. 3d 747, 753 (C.D. Cal. 2020) (noting "Defendants may so argue [their alternative interpretation] to the jury").

Furthermore, rather than addressing the Complaint's allegations, Defendants improperly attempt to rely on extra-Complaint material not subject to judicial notice.  *See* Br. 4 (citing Anaplan's Form 10-K, filed one month after Defendants' corrective disclosure on March 30, 2020 and not alleged in the Complaint); Br. 10 (citing excerpts of Anaplan's earnings press release and presentation, neither of which are alleged in the Complaint).  But these documents are subject to differing inferences that can only be weighed by the jury.  "It is improper to judicially notice an [exhibit] when the substance

of the [exhibit] 'is subject to varying interpretations.'" *Khoja*, 899 F.3d at 1000 (holding judicial notice of transcript "to determine what the investors knew" was an abuse of discretion). This is especially true where, as here, Defendants are attempting to use the external document to dispute well-pleaded factual allegations in the Complaint that Morton was speaking about quarterly growth. The prohibition on judicial notice of information subject to multiple interpretations likewise undermines Defendants' misleading reference to Anaplan's total workforce numbers in 2019 and 2020. The Brief excludes any mention of the relevant sales headcount or the problematic turnover in that department. *See* Br. 4, 10. Defendants again attempt to use these Rule 12 proceedings to resolve issues of fact properly reserved for the jury. *See re Immune Response*, 375 F. Supp. 2d at 1015.

## C.   Defendants' Concealed Risks to Billings Momentum Were Highly Material

Defendants, analysts, and venture capitalists all acknowledged that Billings growth is a critical metric for SaaS companies like Anaplan. ¶¶3-4, 6-9, 30-35, 53, 56, 58, 60, 70, 73, 76, 77. Moreover, Defendants do not contest the materiality of the alleged risks to its Billings growth, *e.g.*, missed quotas, longer sales cycles, lower bookings, frenetic strategy changes, and excessive turnover. Against this context, Defendants' attempt to portray statements about Anaplan's increasing Billings momentum as mere "puffery," Br. 16-17, is both illogical and contrary to controlling authority.

Even assuming *arguendo* that the misleading statements about Anaplan's current Billings momentum, the reasons underlying that momentum, and Defendants' related discussions about Anaplan's "deferred patterns" or "macro concerns" could each be seen in isolation as "assertions of corporate optimism" as Defendants erroneously suggest (Br. 16), in context they "'affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.'" *Quality Sys.*, 865 F.3d at 1144 (internal quotation omitted). Specifically, Defendants tethered their statements to concrete and pointed questions from analysts about the Company's maintenance of its Billings momentum. ¶¶5, 8, 9, 54, 56, 58, 70, 73. They were intended not to simply convey optimism, but to deny any risks to Anaplan's Billings momentum. *Id.* Thus, they are actionable. *Quality Sys.*, 865 F.3d at 1143; *see also, e.g.*, *Sanders v. RealReal, Inc.*, No. 19-cv-07737-EJD, 2021 U.S. Dist. LEXIS 64386, at *28 (N.D. Cal. Mar. 31, 2021) (mischaracterizing perfunctory authentication process as "rigorous" was actionable given context of defendant-CFO's statement that

the process was "literally everything to what we do") (citing *Bricklayers & Masons Loc. Union No. 5 Ohio Pen. Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012) (finding misstatements about deepwater-drilling company's "extensive training and safety programs" actionable in context because of importance of safety in a dangerous industry); *Boston Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361-RS, 2020 U.S. Dist. LEXIS 141724, *23 (N.D. Cal. Aug. 7, 2020) (finding statements like "it's a new day Uber," or that the company was "committed to enhancing safety" actionable when considered in context, even though they were vague in isolation).

None of the cases Defendants cite even remotely suggest that the statements in question be deemed puffery under the context here. *Restoration Robotics*, for example, contrasted the nonactionable puffery in a prospectus from (as here) "reassuring statements ***in response to direct questions from investors***." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1255 (N.D. Cal. 2019) (emphasis added); ¶¶5, 8, 9, 54, 56, 58, 70, 73. Similarly, *Intuitive Surgical* held that "in context" of the market's knowledge "of the difficulties facing Intuitive . . . any reasonable investor would have understood Intuitive's statements as mere corporate optimism." *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). In contrast to Defendants' specific responses to pointed questions about Billings momentum, the *Invuity*, *SolarCity*, and *Cutera* courts rejected vague "feel-good monikers" about the respective businesses in general. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (rejecting assertion in 10-K that "we believe our employee relations are good"); *Paciga v. Invuity Inc.*, No. C 17-01005 JSW, 2018 WL 7286503, at *5 (N.D. Cal. Sept. 26, 2018) (rejecting optimistic statements about company's future); *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 994-95 (N.D. Cal. 2017) (same).[3]

---

[3] Defendants' other cases are similarly inapposite. *Brodsky v. Yahoo!* simply noted that, in contrast to the specific statements here about the lack of risks underlying Anaplan's Billings momentum, "[a]lleging a litany of problems is not enough to refute specifically *general* statements that project optimism and Yahoo!'s growth." (*see* Br. 23, quoting 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009)). Moreover, in *Versant Object* and *Corinthian Colleges*, the statements' characterization as "corporate optimism" was not dispositive. *See In re Versant Object Technology Corp. Securities Litigation*, No. C 98-00299 CW, 2000 U.S. Dist. LEXIS 22333, at *21 (N.D. Cal. May 18, 2000) (finding comments that the company "had 'a very strong sales organization'" lacked falsity because "a company can be losing sales personnel and still have a strong sales organization."); *Karam v. Corinthian Colls., Inc.*, No. CV 10-6523-GHK, 2012 U.S. Dist. LEXIS 188594, at *30-31 (C.D. Cal. Aug. 20, 2012) (finding statements about culture and integrity inactionable due to an inability to determine the problem's magnitude).

### D. Defendants' Concealment of Present Information is Not Shielded By The PSLRA's Limited Safe Harbor for Forward-Looking Statements

The Complaint does not allege that any forward-looking statements were misleading—*i.e.*, that Defendants "merely f[e]ll short of their 'optimistic projections,' which forecloses use of the safe harbor. *Wochos v. Tesla*, 985 F.3d 1180, 1189 (9th Cir. 2021) (quoting *Quality Sys.*, 865 F.3d at 1142). Morton's observation of Anaplan's "billings to track in line with overall revenue growth rates" is a "snapshot" comparing the Company's Billings and revenue growth, not a forward-looking statement, because "descriptions of the present aren't forward looking." *Berson v. Applied Signal Tech. Inc.*, 527 F.3d 982, 990 (9th Cir. 2008). Beyond this one statement, Defendants do not claim that any other statement is forward looking, nor can they. *See* Br. 14-16.

Defendants' other arguments contradict their unsupported conclusion that Morton's statement is "facially forward-looking," Br. 14, as their Brief argues six times that Anaplan's billings statements were not forward-looking guidance. *See* Br. 2 (" . . . caused the Company to miss analysts' billings expectations (which the Company did not forecast), . . . Anaplan never provided Billings guidance to the market . . . But no such guidance was ever given."), p. 4 ("it ***never*** provided guidance or projections for expected billings at any point") (emphasis in original), p. 5 ("At no time did Morton provide any billings guidance"), p. 8 (referencing "a baseless assertion that Defendants had predicted high Q4 2020 billings growth (they did not)"). As there is no indication that Morton's statement is forward-looking, Defendants cannot use the safe harbor. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1193 n.76 (C.D. Cal. 2008) (rejecting its application where "[i]t is not clear this is the kind of statement protected by the safe harbor provision").

Even if the Court found aspects of Morton's statement to be forward looking, it is outside the safe harbor because Morton had "actual knowledge that [his] forward-looking statement[] w[as] false or misleading " and it was not accompanied by "adequate cautionary language." *Quality Sys.*, 865 F.3d at 1149. First, the Complaint sufficiently pleads that Morton knew his omission of serious risks threatening Anaplan's Billings momentum was misleading. *See* pp. 10-14, *supra* & 20-24, *infra*. Second, Defendants' inadequate "cautionary language" lacked specificity and misrepresented present conditions as mere possibilities. Generic statements that management "may not be able to work

together effectively" or that business "would be adversely affected if it was 'unable to . . . attract and retain a high caliber of executives and employees'" (Br. 15) are precisely the types of statements that courts routinely find meaningless because they "are so broad that they apply to *any* business." *Yanek v. STAAR Surgical Co.*, 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005); *see also, e.g.*, *Zaghian v. Farrell*, 675 F. App'x 718, 719-20 (9th Cir. 2017) (holding cautionary language "must have consisted of non-boilerplate warnings that were tailored to the forward-looking statements"); *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1053 (N.D. Cal. 2018) (granting motion on other grounds but finding "general disclaimer" that failed to disclose "company-specific warnings" was not meaningful). Moreover, Defendants' "'cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'" *Countrywide*, 588 F. Supp. 2d at 1178 n.62 (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)). Here, Defendants do not, and cannot directly contest the Complaint's allegations that, immediately prior to the Class Period, Anaplan's management team was then not "work[ing] together effectively" and due to the Company's "hire fast and fire faster" policy, was then "unable to . . . attract and retain a high caliber level of executives and employees." ¶¶36-50.

The cautionary language in Defendants' other cited cases all contain the specificity missing here, and consequently underscore the deficient nature of Defendants' risk warnings. For example, in *Bodri v. GoPro, Inc.*, defendants warned about falling "sales during the holiday season," ineffective "manage[ment] [of] new product introductions" and "product transitions," and "product release patterns," which the court held sufficiently meaningful to shield projections about a new product's holiday launch. *See* 252 F. Supp. 3d 912, 931 (N.D. Cal. 2017). In contrast to Defendants (¶¶66, 68), the company in *Kapur v. USANA Health Sciences., Inc.* **did** disclose "'typically significant turnover in Associates from year to year,' forcing the company to 'continually recruit new Associates.'" *See* No. 2:07-CV-00177DAK, 2008 U.S. Dist. LEXIS 58955, at *15-16 (D. Utah July 23, 2008). The *Cutera* plaintiffs only alleged that the "[e]arnings projections" themselves (which, as Defendants concede, are not present here) were forward looking, so warning that the company's ability to compete and perform depended on the abilities of its sales force "to sell products to new customers and upgraded products to current customers" was sufficiently meaningful. *Cutera*, 610 F.3d at 1112.

### E.    The CW Reports are Reliable and Specific

Unable to attack the Complaint's allegations directly, Defendants improperly attempt to discredit the reports of Anaplan's former employees as "unreliable" and lacking "specificity." Br. 10-11, 18-20. Defendants' credibility attacks lack merit, and are not supported by the cases they cite.

First, the Complaint alleges sufficient specific information about each CW, such as "job description and responsibilities," or the witness's title and immediate supervisor. *Quality Sys.*, 865 F.3d at 1145; ¶¶34 & n.2, 35-41, 43-44, 47 n.3 & 4. And, for many CWs identified, such as for CW4 (VP of Corporate Marketing, ¶36), CW5 (Regional VP of Sales, ¶38), CW6 (Enterprise Account Executive, ¶38), and CW9 (Enterprise Business Development Representative, ¶47) (*see* Br. 11), their "role[s] [are] encapsulated within their job title[s]." *RealReal*, 2021 U.S. Dist. LEXIS 64386, at *24.

In addition to being sufficiently specific, the Complaint adequately alleges why the CW reports are reliable. In assessing CW allegations, the Ninth Circuit looks at "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Sparling v. Daou (In re Daou Sys.)*, 411 F.3d 1006, 1015 (9th Cir. 2005). Courts routinely credit CW accounts like those alleged here that "tell what is essentially the same story . . . from markedly different angles." *See, e.g.*, *Countrywide*, 554 F. Supp. 2d at 1058-59 (finding inference of company-wide scienter supported by accounts from "several geographic areas . . . different levels of the Company hierarchy . . . and remain consistent across different time periods."). Here, taken together with the acknowledged real-time, accurate forecasting abilities of the Company's Platform (¶¶24-27, 83), the Complaint's CWs corroborate blown sales quotas (CW5, CW6, CW7, CW8; ¶38, 39, 40, 41, 45) that appeared on Defendants' reports (CW2, CW3; ¶¶35, 43, 44), leading to extreme sales pressure (CW1, CW4, CW5, CW6, CW7, CW8; ¶36, 40, 41, 42, 49, 50) and excessive turnover at all levels of Anaplan's sales department (CW4, CW6, CW9; ¶46, 47, 50), all of which threatened the Company's tremendous Billings momentum. ¶¶36-50, 52, 55, 57, 59, 66, 68, 71, 74.

Defendants' broad assertion that "CW accounts must be contemporaneous with the alleged misstatements" (Br. 10-11) is not supported by controlling law or even the cases they cite. Instead, courts focus on whether the CW's statements have "sufficient particularity to support the probability

that a person in the position occupied by the source would possess the information alleged."[4]  *Daou*, 411 F.3d at 1015; *see Quality Sys.*, 865 F.3d at 1145 (crediting report from former chief operating officer that Salesforce reports "were available 'at the push of a button'" to the company's executives, even though former COO left the company one year before the class period).  Even one of Defendants' cited cases acknowledges that "[p]re-Class Period CW accounts *can* support and corroborate other statements" so long as there are other accounts "'contemporaneous' with the alleged misstatements." *City of Sunrise Firefighters' Pen. Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2019 U.S. Dist. LEXIS 216801, at *41-42 (N.D. Cal. Dec. 17, 2019); *see* pp. 22-23, *infra*.

Similarly, none of Defendants' cited cases hold that employment during the Class Period is a bright-line test, as they incorrectly assert.  *See* Br. 11.  Instead, the court in *Zucco Partners, LLC v. Digimarc Corp.* found a "human-resources employee" and an "ID Systems Controller," not competent to discuss the "inner workings" of the company's "accounting and financial reporting." *See* 552 F.3d 981, 997 (9th Cir. 2009).  In contrast to the allegations in this Complaint (*see* ¶¶34 & n.2, 35-41, 43-44, 47 n.3 & 4), the plaintiffs in *Applestein v. Medivation, Inc.* did not allege responsibilities or titles for two of the three witnesses, and lacked "alleg[ations] that the confidential witnesses were in a position to have the knowledge they profess." *See* 861 F. Supp. 2d 1030, 1037 (N.D. Cal. 2012) ("[T]he TAC does not explain what a Senior Technology Engineer does and why someone in that position would have knowledge about the Dimebon pills produced for the Phase 2 study."); *see also Paciga v. Invuity Inc.*, 2019 U.S. Dist. LEXIS 135820, *17 (N.D. Cal. Aug. 12, 2019) (rejecting one of at least eight CWs because the complaint "lack[ed] important details . . . including 'his or her job description and responsibilities,' or duties."); *Shurkin v. Golden State Vintners, Inc.*, 471 F. Supp. 2d 998, 1015 (N.D. Cal. 2006) (finding CW who left prior to Class Period cannot reliably discuss "production activity during the 2Q04 that is at issue here").  None of those concerns are present here, as there is no contest the CWs are all alleged to have had responsibilities that would naturally encompass the information they report. *See* Br. 10-13, 18-20.

---

[4] CW3's account was offered to show some of the Billings information sent to Morton.  ¶35. Defendants' claim that CW3 "was not within Anaplan's salesforce and does not allege anything about its practices or morale" is beside the point.  Br. 11 n.10.

### F.    The Complaint Pleads a Strong Inference of Scienter

The Complaint easily satisfies the standard for pleading scienter, which only requires facts from which a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  In the Ninth Circuit, scienter may be established either by showing conscious misbehavior or recklessness, *Quality Sys.*, 865 F.3d at 1144, and can be satisfied by circumstantial evidence, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983).  No smoking gun is required, and well-pleaded factual allegations must be accepted as true.  *Tellabs*, 551 U.S. at 322-24.  Moreover, Defendants do not dispute that Calderoni's and Morton's knowledge and intent are imputed to Anaplan.  They cannot.  "A corporate defendant's scienter is necessarily derived from its employees." *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1120 (C.D. Cal. 2012).

Scienter requires holistic analysis.  "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322-23.  "Accordingly, courts should "consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."  *S. Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  This is because "*Tellabs* permits a series of less precise allegations" even if "[v]ague or ambiguous," to be "read together to meet the PSLRA requirement."  *Id*.

### 1.    The Complaint Alleges a Cogent and Compelling Inference of Scienter

The fraud alleged in the Complaint is Defendants' covering up of risks to Anaplan's growing Billings momentum, then represented "to track in line with overall revenue growth rates."  As detailed below, the Complaint contains ample allegations for a cogent and compelling inference of scienter.

**First**, that Anaplan claimed to have via its Platform real-time insight into sales trends itself provides a strong inference of scienter.  To assuage investors, CFO Morton told investors at the Barclays Conference that Defendants were using Anaplan's Platform capabilities to forecast its bookings, billings, "all of our beat-and-raise models and so on and so on."  ¶83.  Defendants specifically touted the Platform as solving the problem of "limited visibility into pipeline health."  ¶¶27, 83.  Consistent with Defendants' own statements, CW2 and CW3 confirmed that Calderoni and

Morton received reports about Anaplan's Billings, projections thereof, and comparison with prior quarters. ¶¶35, 43-44, 82-83. Given this direct knowledge, there can be no serious dispute that Defendants received Anaplan's "accurate, up-to-date sales forecasts," which were "leverage[d]" with "third-party data as well as historical sales patterns, including trend and seasonality," and "update[d] on the fly based on current market conditions." ¶¶26-27. Anaplan's planning capabilities, combined with Defendants' "specific admissions . . . that they are involved in every detail of the company and that they monitored portions of the company's [planning] database are factors in favor of inferring" scienter. *Nursing Home Pen. Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004).

Defendants' perfunctory statements of black-letter case law show no deficiencies in the Complaint's well-pleaded allegations of scienter. *Glazer Capital Management, LP v. Magistri* held there were insufficient allegations to support senior officials' awareness of "a discrete set of illegal payments made by InVision's foreign sales agents." 549 F.3d 736, 746 (9th Cir. 2008). In *Zendesk*, the plaintiffs did not "plausibly allege[] that Zendesk had reason to know of any weakness" in the company's underperforming regions. *Reidinger v. Zendesk, Inc.*, No. 19-cv-06968-CRB, 2020 U.S. Dist. LEXIS 209548, at *23 (N.D. Cal. Nov. 9, 2020). By contrast, the Complaint here details multiple reasons, including Anaplan's real-time reporting Platform, micromanagement of the sales force, and involvement in sales meetings, all of which corroborate their knowledge of the Company's blown sales quotas, lower bookings, extreme pressure exerted upon sales personnel, and high sales force turnover. ¶¶10-12, 26-27, 35-50, 81-83.

**Second**, Defendants' admission that the components of Anaplan's Billings are "key metrics," and thus "facts critical to a business's core operations," bolster the strong inference of scienter. *S. Ferry*, 542 F.3d at 983; ¶¶4, 33-35, 53, 82. Aside from the Company, analysts and venture capitalists tied their performance expectations of SaaS companies, including Anaplan, to Billings momentum. Defendants do not dispute that it was well understood in the industry that Billings momentum was one of the most important, if not the most important valuation metrics. Given the "prominence" of that metric, the fact that Anaplan's entire business focused upon selling a Platform tracking sales and other business performance, and their personal involvement in sales meetings, "it would be absurd to suggest that" Calderoni and Morton were "without knowledge of" risks threatening Anaplan's Billings

momentum. *Evanston Police Pen. Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601 (N.D. Cal. 2019).

Defendants' "core operations" cases are unpersuasive. *Wozniak v. Align Technology, Inc.* found that alleging mere positions at the company and a general awareness of internal reports, without more, was insufficient to show executives were aware of "significant backlog and problems with" the company's "new suite of software tools." 850 F. Supp. 2d 1029, 1033, 1042 (N.D. Cal. 2012). Defendants' other cited cases stand for this same proposition. *See Intuitive Surgical*, 759 F.3d at 1062 (noting absence of "specific admission[] of detailed involvement in the minutia of a company's operations" as alleged here, *see* ¶83); *City of Royal Oak v. Juniper Nets., Inc.*, 880 F. Supp. 2d 1045, 1068 (N.D. Cal. 2012) (rejecting Plaintiffs' attempt to invoke the core operations doctrine based solely on allegations that the individual defendants "held central corporate roles"); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 843 (N.D. Cal. 2000) (same). The holding in *Metzler Inv. GMBH v. Corinthian Colls., Inc.* is a slight variation: allegations of a generic "management information system," without more, are insufficient to establish scienter. *See* 540 F.3d 1049, 1067-68 (9th Cir. 2008).

**Third**, "[t]aken collectively," the confidential witnesses' statements are "indicative of scienter." *Quality Sys.*, 865 F.3d at 1145 (citing *Zucco Partners*, 552 F.3d at 995 and quoting *Tellabs*, 551 U.S. at 323). Defendants concede that CW1 (Chief Revenue Officer), CW2 (Vice President of Financial Planning and Analysis), and CW4 (Vice President of Corporate Marketing) are alleged to "have had direct, substantive contact with either Calderoni or Morton." Br. 19 (citing ¶¶35, 38-47). This is sufficient. Even Defendants' cited cases concede that some allegations of "direct contact" can suffice to "provide reliable insight into the Individual Defendants' states of mind." *Oracle*, 2019 U.S. Dist. LEXIS 216801 at *57; *see also Intuitive Surgical*, 759 F.3d at 1063 (rejecting single "unsubstantiated statement without substance or context" from a low-level "clinical sales representative"); *In re Accuray Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) (noting six CWs' lack of direct contact and rejecting one CW's single report of senior VP's "optimistic internal target" as lacking sufficient indication that he "knew the revenue forecasts were false when made").

Here, as CW2 confirmed, months before the Class Period, Calderoni was already so fixated on Anaplan's Billings projections that he directly involved himself with his sales teams whenever the

projects were below quota. ¶43. During a job interview before the Class Period,[5] Calderoni openly asked CW4 to help fix Anaplan's "big morale problem." ¶37. CW1 (employed before the Class Period) and CW4 (employed during the Class Period) separately reported that Calderoni's and Morton's meetings with sales leadership devolved into a combative environment, that they hovered over its leadership, changing its plans every few days, and micromanaged the Company's day-to-day operations, all of which supports an inference that Defendants were aware of problems with Anaplan's sales department and other threats to its Billings momentum. ¶¶36, 37.

**Fourth**, the Complaint's allegations about the departures of Anaplan's senior sales leaders, including CW1, Anderson, and Melichorre "constitute evidence of scienter" because "they are 'accompanied by additional evidence of Defendants' wrongdoing.'" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) (quoting *In re Downey Secs. Litig.*, No. CV 08-3261-JFW(RZX), 2009 U.S. Dist. LEXIS 83443, at *13 (C.D. Cal. Aug. 21, 2009)); *see* ¶¶10-13, 36-50, 76-77, 81, 84. The Brief omits discussion of (and thus concedes) the scienter implications arising out of CW1's and Melichorre's exits, and only raises Calderoni's transparent excuse for Anderson's departure. Br. 24. But Defendants omit the market's disbelief of that explanation. *See* ¶77. These facts, combined with the other allegations corroborating the analysts' observations (¶¶36-50) substantially exceed the "conclusory allegations" criticized in *Align Tech.*, and demonstrate Anderson's departure was "uncharacteristic" and "accompanied by suspicious circumstances" and thus supportive of scienter. *See Align Tech.*, 856 F.3d at 622 (quoting *Zucco*, 552 F.3d at 1002).

**Fifth**, allegations of the insiders' stock sales during the Class Period plausibly support a holistic inference of scienter, "even if the sales would alone be insufficient." *Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF, 2020 U.S. Dist. LEXIS 10721, *48 (C.D. Cal. Jan. 17, 2020) (finding stock sales' support for scienter inappropriate for "determin[ation] as a matter of law"). As here, sales by Anaplan's insiders' (Calderoni, Morton, and Director Rob Ward) of "stock around the same time period [*see* ¶¶85-87] is circumstantial evidence of scienter." *In re Galena Biopharma, Inc. Sec. Litig.*,

---

[5] Even if CW 4 started after the Class Period did, as Defendants insinuate (Br. 19 n.14), it is absurd to suggest that Calderoni suddenly became aware of a "big morale problem" at Anaplan in the eight remaining days after the November 21 Earnings Call.

117 F. Supp. 3d 1145, 1203 (D. Or. 2015) (citing *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001). Calderoni's sales of 150% of his pre-Class Period sales in particular were "inconsistent with his prior trading history," and effected right after his misstatements and right before the truth was revealed, thus "maximiz[ing] the personal benefit from undisclosed inside information." *Oracle*, 380 F.3d at 1232.

Defendants' attempt to blunt some of the import of Calderoni's Class Period windfall by asserting use of a 10b5-1 trading plan raises, at most, a question of fact reserved for the jury. Nothing before the Court indicates that those plans were properly entered (without knowledge of material nonpublic information), sufficiently precise to invoke the Rule 10b5-1 safe harbor, or adopted prior to Calderoni's learning of the concealed facts regarding billings momentum, sales personnel retention problems, or executive clashes. Without such information, the Court cannot conclude that Rule 10b5-1 was satisfied or provides any basis to negate the scienter inference from Defendants' decision to dump shares. *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 U.S. Dist. LEXIS 200769, at *56 (N.D. Cal. Nov. 27, 2018); *In re Bridgepoint Educ. Inc. Secs. Litig.*, No. 12-1737, 2013 U.S. Dist. LEXIS 131423, *73 (S.D. Cal. Sep. 13, 2013). Where such information is lacking, several district courts in this Circuit have declined to entertain this affirmative defense on a motion to dismiss.[6] *See, e.g.*, *id*.

### 2.    Defendants Offer No Plausible Competing Inference

The Brief misconstrues Plaintiff's allegations of Scienter. Br. 2, 3, 20, 24, 25. Defendants' fraud is not about "know[ing] billings growth would slip" (Br. 2-3), or knowing that internal forecasts were "manipulated" (Br. 20). Whether such allegations are sufficient to support scienter (Br. 24-25) is irrelevant to this case, which is about concealing known risks. *Apple II* recently rejected this same attempted mischaracterization of scienter allegations, finding "cogent and compelling" allegations of scienter that "raise a strong inference that [the CEO] knew about the *risk*" of an event, even though he may not have known about the event itself. *Apple II*, 2020 U.S. Dist. LEXIS 206298 at *26.

---

[6] Recent analysis indicates pervasive abuse of the 10b5-1 mechanism through "minimal cooling-off periods;" "single-trade plans;" and "plans adopted[,] and with initial trade occurring[,] prior to earnings." David F. Larcker et al., *Gaming the System: Three "Red Flags" of Potential 10b5-1 Abuse* 3, Stanford Corp. Governance Research Initiative, *available at*: https://www.gsb.stanford.edu /sites/default/files/publication-pdf/cgri-closer-look-88-gaming-the-system.pdf (Jan. 19, 2021). As that article notes, it is highly "unlikely that [executives] can enter a plan" after quarter-end and before earnings "without having [materially nonpublic information]." *Id.*

Just like the *Apple* defendants, Defendants here attempt to shield themselves with the irrelevant assertion that they did not know "growth would slip." *See* Br. 25. And just like in *Apple*, Plaintiff here has alleged extensive facts indicating that Defendants either intended to hide adverse, then-known information threatening Anaplan's Billings momentum, or were at least deliberately reckless to the danger of misleading investors by omitting that information. *See* pp. 20-24, *supra*.

Moreover, Defendants fail to provide any plausible competing inference for concealing blown commits and quotas, larger sales cycles and smaller Billings, frenetic strategic changes, and excessive turnover throughout the sales team—all risks to Anaplan's Billings momentum. While Defendants claim that they "got it wrong" and were "genuinely optimistic about Q4 2020," this is not a competing inference. Br. 18, 25. Plaintiffs allege Defendants concealed known adverse facts that undermined Defendants' positive statements about Anaplan's Billings momentum. ¶¶10-12, 36-50, 52, 55, 57, 59, 66, 68, 71, 74. Defendants have no innocent explanation, plausible or otherwise, for hiding these risks.

Nor does it matter that "billings did not materialize at the end of the quarter as expected." Br. 25. As the Supreme Court made clear in *Matrixx*, an uncertain outcome does not undermine a strong inference that defendants acted with scienter in withholding then-known risks from investors. *See* 563 U.S. at 48-49 (finding scienter was alleged where defendants concealed known information of *possible* side effect to product, even though there was no proved causal link). The Ninth Circuit has repeatedly reached similar conclusions. *See Zaghian*, 675 Fed. App'x at 721 ("'[F]ailure to inform the market about the risk" of users' lack of interest in pending software "raises a strong inference of scienter.") (quotation omitted); *Arena Pharm.*, 840 F.3d at 708 (compelling inference of scienter where "theory of fraud is that Defendants intentionally withheld information material to the market's assessment of whether and when the FDA would likely approve lorcaserin" not simply that "Defendants intentionally misled the market about the objective safety of lorcaserin").

## II.    The Complaint States Claims Against Calderoni and Morton Under §20(a)

Defendants do not dispute that, having otherwise alleged a primary violation under Rule 10b-5, the Complaint states claims for control-person liability under §20(a). Br. 25:22-23; ¶¶110-16.

### CONCLUSION

For the forgoing reasons, Defendants' motion should be denied in its entirety.

Dated: May 7, 2021

Respectfully submitted,

**POMERANTZ LLP**

By:     /s/ Joshua B. Silverman
       Patrick V. Dahlstrom (*pro hac vice*)
       Joshua B. Silverman (*pro hac vice*)
       Jared M. Schneider (*pro hac vice*)
       10 S. LaSalle St., Suite 3505
       Chicago, Illinois 60603
       Telephone: (312) 377-1181
       pdahlstrom@pomlaw.com
       jbsilverman@pomlaw.com
       jschneider@pomlaw.com

Jordan L. Lurie (SBN 130013)
Ari Y. Basser (SBN 272618)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 432-8492
jllurie@pomlaw.com
abasser@pomlaw.com

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

***Counsel for Lead Plaintiff Fadel Sakkal***