1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FADEL SAKKAL, et al.,

            Plaintiffs,

    v.

ANAPLAN INC., et al.,

            Defendants.

Case No. 20-cv-05959-RS

**ORDER GRANTING MOTION TO DISMISS**

## I. INTRODUCTION

This federal securities class action arises out of allegedly false and misleading statements made by Anaplan Inc. ("Anaplan"), its CEO Frank Calderoni, and its CFO David Morton to investors in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Though the complaint certainly describes a toxic and abrasive work environment, it does not plead securities fraud. The motion is accordingly granted with leave to amend. The requests for incorporation by reference and judicial notice are granted in part and denied in part.

## II. BACKGROUND[1]

### A. The Company

Anaplan is a software-as-a-service company providing planning and decision-making software to companies. Its platform seeks to "fundamentally transform[] planning by connecting

---

[1] The factual background is based on the allegations in the complaint (which must be taken as true for purposes of this motion), documents incorporated by reference, and documents of which judicial notice may be taken. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

all of the people, data, and plans needed to accelerate business value and enable real-time planning and decision-making in rapidly changing business environments." Amended Complaint ("AC") ¶ 2 (alteration in original). One of its tools, Anaplan for Sales Forecasting, claims to obviate "[d]elays in forecasting due to manual and siloed processes" by "[e]nabl[ing] accurate, real-time forecast creation in one place while automatically surfacing actionable insights to improve sales productivity." *Id.* ¶ 27.

Unlike many other software companies, Anaplan's direct sales team sells subscriptions, which "creat[e] a stream of recurring revenue." *Id.* ¶ 3. Plaintiff indicates that under Generally Accepted Account Practices, a focus on reported "revenue" would inadequately capture subscription business generated within a given period, leading investors and analysts to focus on the growth of Anaplan's "billings." He defines "billings" as the sum of Anaplan's periodic revenue and the change in its deferred revenue. *Id.* ¶ 31. Growth of this "billings" metric is measured year-over-year, meaning the fourth quarter of 2018 would be compared to the fourth quarter of 2019. Analysts endorsed the idea that Anaplan's billings were a "key performance indicator." *Id.* ¶ 32.

Anaplan tracked billings, along with other related metrics including "bookings" and "backlog." While a "booking" is "the entire value of the contract," "billings," in the context of a single contract, refers to the "total revenue the Company expects to recognize over the coming year from that contract." *Id.* ¶ 34. Confidential Witness ("CW") 3, a Senior Revenue Accountant at Anaplan from May 2019 to September 2020, was personally involved in preparing two reports presented to Morton at the monthly CFO meeting – the "BBB" (bookings, billings, and backlogs) report and the billing analysis report, which included all the invoices from the current month, compared month-over-month billings, assessed billings, and accounted for variances.

## B.  The Culture

It was reportedly well-known that Calderoni and Morton often clashed with the sales team. According to CW1, Chief Revenue Officer from February 2018 to April 2019, Calderoni's "veins popp[ed] out of his neck while he screamed expletives at Anaplan's [sales] executives," creating

ORDER GRANTING MOTION TO DISMISS
CASE NO. 20-cv-05959-RS

United States District Court
Northern District of California

"a combative environment on steroids." *Id.* ¶ 36. CW1 also reported, and CW4 (Anaplan's former Vice President of Corporate Marketing from November 2019 to June 2020) corroborated, that Calderoni "hovered over the sales department," interfering with, and sometimes overruling, leadership decisions and micromanaging day-to-day operations. Calderoni's "erratic" changes, CW4 said, "adversely affected" the sales team by "creating an environment of chaos and paralysis." *Id.* ¶ 36–37. Yet Calderoni asked CW4 at their job interview to fix Anaplan's "big morale problem." *Id.* ¶ 37.

The demand that salespeople meet "unachievable" quotas exacerbated the problem. *Id.* ¶ 38. CW7, a Strategic Account Executive from August 2018 to November 2019, explained that salespeople assign closing probabilities a stage (i.e., 30% of closing is a stage 2 while 50% is stage 4), though CW8, a Strategic Account Executive from early 2018 to early 2019, recalled that a deal only had to be 80% to 90% likely to close to be labeled a "commit." *Id.* ¶ 39. According to CW5, Anaplan's Regional Vice President of Sales from September 2010 to April 2020, CW6, an Enterprise Account Executive from March 2018 to December 2019, and CW7, only 10% to 20% of the sales team met their quotas, compared to 50% at CW7's previous employer.

In addition to urging overcommitment, sales managers routinely inflated these "stages" in the billings projections, said CW7.[2] Sales managers would routinely report deals assigned a 50% chance of closing by salespeople as likely to close by the end of the quarter, but rarely downgraded the likeliness of closing. Many of the CWs agreed that salespeople were pressured to exaggerate the likelihood that deals would close. CW6 recalled threats from their manager that "people who don't have [sales] pipeline don't have jobs." *Id.* ¶ 41.

This intense focus on the pipeline permeated the company. CW7's supervisor indicated that she and the other sales managers "ran the Company's sales forecasting model each week" in order to report it to "everybody" in leadership. *Id.* ¶ 43. CW2, Vice President of Financial

---

[2] Notably, it is unclear whether these projections are the ones that went into the BBB report handed to Morton every month.

ORDER GRANTING MOTION TO DISMISS
CASE NO. 20-cv-05959-RS

1    Planning and Analysis from September 2017 to June 2019, recalled Calderoni was so "fixated" on

2    billings that he would get "directly" involved with sales teams who did not meet their quotas. *Id.*

3         This intense pressure to overcommit, Plaintiff alleges, resulted in an artificial inflation of

4    Anaplan's billings, a delay and decrease in billings, and high turnover in the sales department.

5    CW2 said that the software he developed to model and project billings and billings growth

6    incorporated the exaggerated data manipulated by the sales managers. CW7 reported that the

7    forecasting practices forced commitments to be pushed to later quarters at lower closes. For

8    example, one of CW7's deals that was originally expected to close in the fourth quarter of fiscal

9    year 2020 at $1.3 million eventually closed in the first quarter of fiscal year 2021 for $400,000.

10   CW6 observed a high turnover rate throughout the sales department, as sales managers were urged

11   to "hire fast and fire faster." *Id.* ¶ 46. CW4 lamented that Calderoni drove away all the best sales

12   and marketing people, including Global Customer Officer Paul Melchiorre, held up as a "guru" of

13   the platform by CW9, an Enterprise Business Development Representative at Anaplan from

14   October 2017 to July 2020, and CW10, Corporate Strategic Advisor at Anaplan from January

15   2020 to April 2020. Chief Growth Officer Mark Anderson, hired August 5, 2019 and touted by

16   Calderoni as a "visionary growth leader," and by CW4 as a "rock star sales guy," also left quickly,

17   purportedly to spend more time with his family. *Id.* ¶ 48.

18        **C. The Call and Other Allegedly False and Misleading Statements**

19            *1. November 21 Earnings Call*

20        Just before the start of the Class Period, which ran from November 21, 2019 through

21   February 26, 2020, analysts praised Anaplan's billings growth as "further validation of strong

22   sales trends." *Id*. ¶ 4. Nonetheless, the "billings acceleration" announced at the November 21,

23   2019 earnings call for the fiscal third quarter of 2020 "eclipsed the market's high expectations."

24   *Id.* On that call, Morton announced Anaplan's billings had grown by 59% year-over-year,

25   exceeding the previous fiscal quarter's acceleration by 13%, and made the first of many allegedly

26   false or misleading statements. Calderoni looked favorably back on the past year, boasting that

27   Anaplan was "able to attract impressive leaders and innovative talent, who will continue to elevate

28

United States District Court
Northern District of California

us further." He also stated: "we have a lot more momentum ahead of us." *Id.* ¶ 51. Morton summarized Anaplan's achievements that quarter and added that, looking forward, "[f]or the full fiscal 2020, we are raising our revenue and operating margin outlook driven by the third quarter performance and ongoing strength we see in our business[,]" concluding that "we believe billings to track in line with overall revenue growth rates and our net dollar expansion rate to remain above 120%." *Id.* ¶ 53.

In response to an analyst asking for advice regarding "deferred patterns," Morton said he expected to "continue on at the rate and pace as we guide our performance this year within the lines of the preliminary guidance we gave for next fiscal year." *Id.* ¶ 54. When another analyst asked about Anaplan's "sales organization, and kind of how will we see it reflected in the numbers around sales productivity . . . as we continue to go along?" Calderoni talked about growth and change in Anaplan's sales force, specifically noting "Mark [Anderson] is even helping us now kind of go to that next level, which is how do we continue this process, continue the productivity, continue the connection with some of these large experienced partners that we have. And I think, we'll continue to see benefit as we continue down that path." *Id.* ¶ 56.

Later, an analyst asked if Anaplan had any "commentary" on "macro concerns" and how Anaplan was thinking about, or considering changing, its sales organization with the addition of Mark Anderson. Calderoni answered: "we are not seeing any changes in the macro environment or within deal cycles or anything like that. So I would say, nothing that we've observed more recently." *Id.* ¶ 58. He praised Mark Anderson again, explaining that he had been focused "in the first couple of months, clearly, on ensuring that we continue to have the right skills and the talent" and that Anderson had the experience and perspective to help Anaplan "as we continue to scale, if we want to think about getting to $1 billion or even beyond that." *Id.* Calderoni concluded: "he's helping the team that we've developed over the last couple of years, move up to that next level as we get ready for '21." *Id.* Investors were galvanized by the call and Anaplan's share price went up about 8% to $53.09 per share.

United States District Court
Northern District of California

### 2. *December 2019 Form 10-Q*

On December 9, 2019, Defendants filed Anaplan's Form 10-Q for the third fiscal quarter of 2020. Item 2 requests information pursuant to Item 303 of Regulation S-K, which requires a description of "any known trends or uncertainties" that have had or that Anaplan reasonably expects will have a "material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Id.* ¶ 62 (citing 17 C.F.R. § 229.303(a)(3)(ii)). Plaintiff alleges Anaplan improperly declined to include information related to (a) slowing billings growth, (b) excessive turnover in the sales department, and (c) crucial leadership changes. Instead, under the heading "Factors Affecting Our Performance," Defendants wrote, among other things: "We are continually hiring significant numbers of sales personnel and our ability to increase our revenue will depend on the new members of our sales force becoming fully productive." AC ¶ 65. Plaintiff also alleges the 10-Q form contained only "generic, boilerplate risk warnings" that were misleading because they had already come to fruition. Specifically, Anaplan claimed (1) "Our corporate culture promotes visionary thinking, teamwork and creativity, and if we cannot maintain this culture as we grow, it could harm our business" and (2) "We hope to maintain our growth trajectory and will continue to hire aggressively as we expand, especially engineering, research and development and sales personnel. If we do not continue to maintain our corporate culture as we grow, we may be unable to foster the innovation, creativity, and entrepreneurial spirit we believe we need to support our growth. Even when we hire aggressively, we may not be able to effectively integrate new hires in our fast-paced culture." *Id.* ¶ 67.

### 3. *Barclays Global Technology, Media, and Telecommunications Conference*

On December 11, 2019, Morton presented at the Barclays Global Technology, Media, and Telecommunications Conference in Los Angeles, California. The moderator noted Anaplan's atypical growth after its IPO and asked "[C]an you talk to kind of what happened there?" and highlighted "skill sales organization, sales enablement, . . . [and] the partner program." *Id.* ¶ 70. In response, Morton gushed about the platform, "[t]o us, it's like reading keys on a piano. It's pretty straightforward" and the executive talent: "when you think about that cohort, I mean, everybody

1    around our table has been in some sort of executive kind of position at a public company north of

2    $1 billion. And that's really kind of our framework." *Id.*

3              **4.  *December 13, 2019 CNBC Appearance***

4              On December 13, 2019, Calderoni appeared on CNBC's *Mad Money*. The host highlighted

5    "the billings accelerator" and asked him "how does someone go from 46% to 59% acceleration?"

6    *Id.* ¶ 73. Calderoni explained that the industry was generally trending upward but boasted: "we've

7    got a great platform that we can offer great value in a reasonable amount of time for companies to

8    implement Anaplan and then also accelerate and that's really what's driving our growth." *Id.*

9                              **III. LEGAL STANDARD**

10              A complaint must contain "a short and plain statement of the claim showing that the

11   pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not

12   required, a complaint must include sufficient facts to "state a claim to relief that is plausible on its

13   face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S.

14   544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court

15   to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A

16   motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests

17   the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*,

18   51 F.3d 1480, 1484 (9th Cir.1995). Dismissal under Rule 12(b)(6) may be based either on the

19   "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a

20   cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988).

21   When evaluating such a motion, the court must accept all material allegations in the complaint as

22   true, even if doubtful, and construe them in the light most favorable to the nonmovant. *Twombly*,

23   550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are

24   insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co*.,

25   83 F.3d 1136, 1140 (9th Cir.1996); see also *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at

26   555 ("Threadbare recitals of the elements of the cause of action, supported by mere conclusory

27   statements, do not suffice.")).

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    Complaints in securities cases must also meet the pleading standards set forth by the

2    Private Securities Litigation Reform Act ("PSLRA"). The PSLRA mandates that "securities fraud

3    complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief'

4    that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise

5    to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharm., Inc.*

6    *v. Broudo*, 544 U.S. 336, 345 (2005) (alterations in original) (quoting 15 U.S.C. §§ 78u–4(b)(1)–

7    (2)). Furthermore, securities claims which are "grounded in fraud" must meet the pleading

8    requirements of Rule 9(b). *In re Rigel Pharms., Inc. Secs. Litig*., 697 F.3d 869, 886 (9th Cir.

9    2012). "To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the

10   misconduct charged, as well as what is false or misleading about [the purportedly fraudulent]

11   statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d

12   1047, 1055 (9th Cir. 2011) (internal quotation marks omitted) (alteration in original).

13                        **IV. DISCUSSION**[3]

14   To state a claim under Section 10(b) of the Securities Exchange Act, Plaintiff must plead

15   specific facts showing: "(1) a material misrepresentation or omission by the defendant; (2)

16   scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

17   security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

18   causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).

19   The complaint stumbles at the threshold because it does not plead a misrepresentation or

20   omission. Most of the statements plainly constitute non-actionable puffery at best.[4] "In the Ninth

21

22   [3] Defendants seeks judicial notice or to incorporate by reference 19 exhibits. "[A] court may take
     judicial notice of matters of public record …[b]ut a court cannot take judicial notice of disputed
23   facts contained in such public records." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999
     (9th Cir. 2018). A defendant may also seek to incorporate by reference a document into the
24   complaint "if the plaintiff refers extensively to the document or the document forms the basis of
     the plaintiff's claim." *Id*. at 1002. Plaintiff opposes the request as to exhibits 1, 5, 10, 11, 13, 15,
25   16, and 19. Because this order does not rely on or consider those exhibits, they will not be
     incorporated or noticed. The request is granted as to all other exhibits.
26

     [4] The emphasized sections of Defendants' comments set forth in the complaint, presumably their
27   strongest evidence, are no less subject to that characterization.

28                                                      ORDER GRANTING MOTION TO DISMISS
                                                        CASE NO.  20-cv-05959-RS

                                          8

Circuit, 'vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws' because no reasonable investor would rely on such statements." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F.Supp.3d 1242, 1255 (N.D. Cal. 2019). "[I]nvestors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Securities Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Phrases such as "[o]ur corporate culture promotes visionary thinking, teamwork, and creativity," AC ¶ 67, "we were able to attract impressive leaders and innovative talent[] who will continue to elevate us further," *id.* ¶ 51, "we have a lot more momentum ahead of us," *id.*, and "[T]o us, it's like reading keys on a piano, it's pretty straightforward.", *id.* ¶ 70, are "mildly optimistic, subjective assessment[s]" which "hardly amount[] to a securities violation." *Id.* Accordingly, Plaintiff's challenges to Defendants' statements generally praising Anaplan's corporate culture, products, or prospects fail to state a claim. *See* AC ¶¶ 51, 54, 56, 58 ("Mark has been focused in the first couple of months, clearly, on ensuring that we continue to have the right skills and the talent. . ." and "the great thing about having Mark on board, is he has the view of [sic] as we continue to look out what is necessary as we continue to scale, if we want to think about getting to $1 billion or even beyond that[]" and "[Mark's] helping the team that we've developed over the last couple of years, move up to that next level as we get ready for '21"), 67, 70, 73.

The four remaining statements, in paragraphs 53, 58 and 65, fare no better. The only potentially actionable statements in paragraphs 53 and 58 are Morton's statement that Defendants "believe billings to track in line with overall revenue growth rates and our net dollar expansion rate to remain above 120%" and Calderoni's statement that "we are not seeing any changes in the macro environment or within deal cycles or anything like that," respectively. Plaintiffs contend these statements omit the fact that Anaplan's billings growth was slowing, which is a change in the "macro environment." In response, Defendants point out that Plaintiff makes no particularized allegation showing Anaplan's billings had actually slowed at that time. Nor can he, they argue, because the statement was made only three weeks into the quarter. Considering Anaplan's

1    disclosure to its investors that a "relatively large number of transactions occur at the end of the

2    quarter," it is indeed unlikely Plaintiff could show that Anaplan's billings growth had slowed in a

3    way that would affect projections or quarterly performance. Yong Declaration ("Yong Decl.") Ex

4    7 at 39. Thus, Defendants did not fraudulently omit a material fact.

5          Even if the statements in paragraph 53 were false,[5] the PSLRA provides safe harbor. A

6    company cannot be liable under Section 10(b) for making forward-looking statements if (1) the

7    statements are identified as forward-looking and are accompanied by "meaningful cautionary

8    statements" or (2) the statements are made without "actual knowledge" that they were false or

9    misleading. 15 U.S.C. § 78u-5(c)(1); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189–90 (9th Cir.

10   2021). Morton's statement that billing growth would "track in line with overall revenue growth

11   rates," AC ¶ 53, is a "classic growth and revenue projection[]," which the Ninth Circuit has

12   described as facially forward-looking. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759

13   F.3d 1051, 1058 (9th Cir. 2014). Plaintiff's argument that it cannot be forward-looking because

14   Defendants repeatedly deny issuing billings guidance is inapposite. The term "billings guidance"

15   refers to a specific kind of report; it does not encompass every forecast related to billings. Nor is

16   the statement a "snapshot." *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir.

17   2008). Morton made the statement among a variety of other projections about "future economic

18   performance," indicating he used the word "believe" to convey a prediction about the future. *See*

19   *id.* It is thus warranted to characterize the statement as forward-looking.

20         Morton's statement meets both requirements of the first safe harbor provision. Before

21   Morton made the statement, he indicated his discussion would be "looking ahead." Yong Decl.

22   Ex. 8 at 7. He also set off the statement with the specific, directed cautionary statement:

23   "[C]alculating billings can fluctuate from quarter-to-quarter, impacted by timing of renewals and

24   transactions." AC ¶ 53. This warning is not boilerplate nor "so broad that [it] could apply to any

25

26   [5] Defendant's argument that Morton's statement communicated an expectation of long-term, rather
     than year-over-year quarterly growth, is improper at this stage because it requires the
27   interpretation of external evidence.

28

United States District Court
Northern District of California

business[.]" *See Yanek v. STAAR Surgical Co*., 388 F.Supp.2d 1110, 1123 (C.D. Cal. 2005). Indeed, it may encompass one of the issues Plaintiff complains Defendant repeatedly omits – the "timing of . . . transactions" speaks directly to potentially lengthening deal cycles. Plaintiff's argument that the statement is not entitled to safe harbor protection because Morton knew it was false when he said it also misfires. The Ninth Circuit has specifically explained that "the use of the disjunctive term 'or' between subclauses (A) and (B) confirms that a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *Wochos*, 985 F.3d at 1190 (internal quotation marks omitted) (emphasis in original). Because the statement in paragraph 53 is entitled to safe harbor protection, it cannot provide the basis for a violation of Section 10(b).

Lastly, Plaintiff has not put forth evidence controverting the statement in paragraph 65 that Anaplan is "continually hiring significant numbers of sales personnel and [its] ability to increase [its] revenue will depend on the new members of [its] sales force becoming fully productive." In his opposition, Plaintiff argues he need not contradict the statement, but rather must only plausibly allege why the statement is misleading. This pleading obligation was satisfied, he contends, by his explanation that Defendants' "hire fast and fire faster" policy would result in a work force that could never become "fully productive." Even if this statement was properly interpreted in the manner advanced by Plaintiff, he has provided no factual detail to substantiate the predicate allegation that Anaplan's salesforce was not growing. *See McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *11, (N.D. Cal. Aug. 7, 2019) (dismissing a challenge related to "staffing problems" because Plaintiffs "failed to allege with particularity salesforce understaffing as opposed to salesforce turnover"). Without an allegation the salesforce was turning over so fast it was actually shrinking, Plaintiff's theory that Defendants knew sales turnover was leading to depressed billings makes no sense. The statement in paragraph 65 is therefore not misleading.

At base, this case appears to be similar to *Aerohive*, in which the court dismissed a complaint alleging Defendants "knew but omitted material information concerning sales personnel

1    issues and sales strategy failures." *Id.* at *10. As that court observed, the United States Supreme

2    Court held that "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and

3    all material information." *Id.* (citing *Matrixx*, 563 U.S. at 44–45). Anaplan accordingly had no

4    obligation to warn the market that there was turmoil in the executive suite.  None of the four

5    actionable statements can sustain a securities fraud claim.

6         Even assuming one or more of those statements were misleading, the complaint does not

7    set forth a "cogent" and "compelling" inference of scienter, the "mental state embracing intent to

8    deceive, manipulate, or defraud." *See Tellabs*, 551 U.S. 308, 314, 319 (2007).  Under the PSLRA,

9    a complaint "must contain allegations of specific contemporaneous statements or conditions that

10   demonstrate the intentional or the deliberately reckless false or misleading nature of the statements

11   when made." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066 (9th Cir.

12   2008).

13        At the highest level of generality, the complaint seems to insinuate that Calderoni and

14   Morton, and therefore Anaplan, had the requisite mental state because they were aware that the

15   toxic corporate culture within the sales team created the risk that Anaplan's billings momentum

16   was slowing. Plaintiff relies mostly on CWs and six other "additional allegations" to make this

17   argument.

18        Yet Plaintiff's reliance on the CWs is misplaced. To rely on statements of a CW to plead

19   scienter, the allegations "must pass two hurdles": (1) the sources "must be described with

20   sufficient particularity to establish their reliability and personal knowledge"; and (2) the reported

21   statements "must themselves be indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*,

22   552 F.3d 981, 995 (9th Cir. 2009). Though the parties disagree about whether CWs must have

23   been employed by the company during the class period to be relied upon, it is ultimately irrelevant

24   because the CW reports are neither anchored in time nor tethered to any particular allegedly false

25   or misleading statements. Furthermore, none of the CWs had any significant contact with

26   Calderoni or Morton that could show what the individual Defendants actually knew, or should

27   have known, during the class period. CW2's creation and distribution of billings reports at the

28

United States District Court
Northern District of California

monthly CFO meetings comes the closest but is not on its own capable of bearing the scienter inference. The general sentiment communicated by the CWs that Calderoni and Morton were, themselves, responsible for the environment and therefore must have known about it and perceived the risk to Anaplan's billings momentum also cannot establish scienter.

The other six allegations do not change this conclusion. First, Plaintiff's novel theory that Anaplan's reliance on its own platform, which it marketed as solving the problem of "limited visibility into pipeline health," AC ¶ 27, is creative but ultimately falls flat. An allegation that scienter must lie where defendants rely on good technological forecasting is not supported by case law and would de-fang the "exacting" "strong inference" requirement. *Nguygen v. Endologix*, 962 F.3d 405, 414 (9th Cir. 2020). That the technology is Defendants' own is irrelevant. Second, the "core operations" doctrine, which assumes corporate officers "have knowledge of the critical core operation of their companies," *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021), comes into play only in an "exceedingly rare category of cases," *S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008). The CWs' allegations of micromanagement and involvement with underperforming sales teams do not suggest Defendants had "actual access" to the relevant information or indicate it would be "absurd" to suggest that management was unaware of the alleged risk. *Prodanova*, 993 F.3d at 1111. Third, as discussed above, the CWs' statements, even taken together, are not indicative of scienter. Fourth, the simple fact of the departures of many important sales leaders raises only speculation. It cannot sustain a finding of scienter when none of the CWs allege Anderson, or any of the others, departed for other than legitimate reasons. Fifth, and finally, allegations of insiders' stock sales, even if suspicious, cannot on their own provide sufficient evidence of scienter.

Lastly, even a "holistic review" does not support an inference of scienter. *See Zucco*, 552 F.3d at 1006. If Plaintiff is alleging Defendants obfuscated known risks to Anaplan's billing momentum, Plaintiff must assume Defendants knew billings were slowing and, more importantly *why* billings were slowing. Yet Plaintiff makes no allegation in the complaint underpinning his belief that it was, in fact, the corporate culture that led to a sudden downturn in Anaplan's billings

growth. According to the CWs, Anaplan's culture was toxic for many months before the class period. Yet these were the very months in which Anaplan previously reported staggeringly high billings growth. Plaintiff offers no theory that outweighs the inference "management believed in its ability to close existing deals." *In re SunPower Corp. Sec. Litig.*, 2018 WL 4904904, at *5 (N.D. Cal. Oct. 9, 2018).

The complaint does not sufficiently aver Defendants made any actionable false or misleading statements or acted with the requisite mental state. It has thus not presented a cognizable Section 10(b) violation. The Section 20(a) claim, derivative of the requisite 10(b) showing, must also therefore be dismissed.

### V. CONCLUSION

For the reasons set forth above, the motion is granted with leave to amend. In the event Plaintiff elects to file an amended complaint, he must do so within 21 days of the date of this order.

**IT IS SO ORDERED**.

Dated: August 31, 2021

RICHARD SEEBORG
Chief United States District Judge