**Pages 1 - 37**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg

FADEL SAKKAL, individually and )
on behalf of all others        )
similarly situated,            )
                               )
          Plaintiff,           )
                               )
  VS.                          )  **NO. C 20-05959 RS**
                               )
ANAPLAN INC., FRANK CALDERONI, )
and DAVID H. MORTON,           )
                               )
          Defendants.          )
_____)

San Francisco, California
Thursday, August 26, 2021

**TRANSCRIPT OF REMOTE PROCEEDINGS**

**APPEARANCES**: (Via Zoom videoconference.)
For Plaintiff:
                    POMERANTZ LLP
                    10 South LaSalle Street - Suite 3505
                    Chicago, Illinois  60603
               BY:  **OMAR JAFRI, ATTORNEY AT LAW**
                    **JOSH B. SILVERMAN, ATTORNEY AT LAW**

For Defendants:
                    KATTEN MUCHIN ROSENMAN LLP
                    525 W. Monroe Street
                    Chicago, Illinois  60661
               BY:  **MICHAEL J. LOHNES, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported Remotely By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
                       Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

For Defendants:

KATTEN MUCHIN ROSENMAN LLP
2121 Avenue of the Stars - Suite 1100
Los Angeles, California  90067
BY:  **BRUCE G. VANYO, ATTORNEY AT LAW**
     **PAUL S. YONG, ATTORNEY AT LAW**

**Thursday - August 26, 2021**                                    **1:28 p.m.**

                               **P R O C E E D I N G S**

                                    ---o0o---

        THE CLERK:  Calling case 20-cv-5959, Sakkal vs. Anaplan.

    Counsel, please state your appearances.

        MR. JAFRI:  Good morning, Your Honor.

        MR. LOHNES:  Good morning, Your Honor.  Sorry.  Go ahead.

        MR. JAFRI:  Omar Jafri from Pomerantz for the plaintiffs.

        THE COURT:  Good afternoon.

        MR. LOHNES:  Good morning, Your Honor.  This is Mike Lohnes on behalf of the defendants.  I have with me my colleagues Bruce Vanyo and Paul Yong.

        THE COURT:  And good afternoon.

    Are you in a different time zone?  I think it's the afternoon, but --

        MR. VANYO:  It is, yes.

        MR. LOHNES:  It's still afternoon in Chicago.

        THE COURT:  Fair enough.

    Go ahead.

        MR. SILVERMAN:  Good afternoon, Your Honor.  Josh Silverman of Pomerantz for the plaintiffs as well.

        THE COURT:  Good afternoon.

Okay.  Everyone accounted for.

This matter is on my calendar for the motion to dismiss the amended class action complaint, and I have had a chance to go through what you've submitted to me, so let me just give you my tentative read and then you can address it accordingly.

I am inclined to grant the motion with leave to amend.  I don't really see a basis to conclude that the identified statements represent material misrepresentations or admissions.  At most, I do think they're non-actionable puffery.  And I also don't see a plausible basis to infer scienter as presented here.

The complaint paints the picture perhaps of an abusive, disorganized workplace, I think, Mr. Calderoni leading that up, but I don't see it as really presenting a securities fraud violation.

So that being my tentative view, I was going to look first to the plaintiff to go ahead and tell me why I'm not reading it correctly.

**MR. JAFRI:**  Good afternoon, Your Honor.  This is Omar Jafri.

**THE COURT:**  Good afternoon.

**MR. JAFRI:**  In terms of the idea that most of the statements are puffery, there is this assumption in the defendants' brief that they can get to attack the chosen statements, and they focus on two of them, but they don't

really get into details about why the others are puffery.

As you mentioned in -- or analyzed correctly in the *Uber Technologies* case, whether a statement is puffery really depends on its context.  And here in the motions there is no attempt to really describe why, in the context that is given, any of the statements are puffery.  They focus mostly on some of the phrases such as "strong," and so on and so forth, and say --

**THE COURT:**  But, Mr. Jafri, going back a step, I'm having trouble even seeing what the concrete representation is.  I mean, you're talking a lot about -- there's a lot of the complaint which really, as I said, I think it's more painting a picture of just -- and I'll accept it all as true -- you know, a not pleasant workplace, with Mr. Calderoni bouncing off walls and making all sorts of statements, and hiring people and firing people.

Well, okay.  I'll assume that's all correct, that there's a dysfunctional workplace there.  What I'm looking for is:  What are the specific representations or omissions to the marketplace about the performance of this company that mis- -- that would have misled the investing public?

And it's all very amorphous.  It's sort of generalized information about growth and the like.  And I don't see much concrete here.

**MR. JAFRI:**  So, Your Honor, I would focus on some of

the statements that were made on November 21st, 2019, with respect to Mr. Anderson specifically. They were pointed analyst questions about what Mr. Anderson would contribute to the business.

THE COURT: Right. But, again, that's the earnings call on November 21st. Mr. Anderson, let's assume he's the greatest growth manager in the world, and so he comes on and then, according to you, he has a falling out, and they say it's because he won't release because he wants to spend time with his family.

What are they supposed -- what's the company supposed to announce to the public, that -- oh, well, this wunderkind that we hired, now he's not going to be here anymore.

I mean, where is the misrepresentation?

They're saying, "Oh, we've got this great employee," and the employee leaves.

Okay. Where is there a misrepresentation or omission there?

MR. JAFRI: So the misrepresentation specifically with respect to Mr. Anderson on this date was that he was already going to -- was working towards taking the company to the next level. And that was made in the context of landing and expanding deals. That was the specific misrepresentation that was made.

THE COURT: Well, wait. Wait a minute.

Is the representation -- do you take from that that there is some representation that they're guaranteeing the marketplace he's going to remain in place and -- I mean, what specific -- effectively, what you're saying is the company announces he's a great manager and he's really going to -- he's going to bring us to the next level.

That's the most amorphous statement that I can come up with.  What's that mean?

**MR. JAFRI:**  Well, I think, in the context of landing and expanding deals, which was what the context was where this statement was made, the representation that they were trying to make was that the business would have momentum, that the billings growth would continue on in that fashion, and that was in response to pointed analyst questions.

And I think it would be one thing if, in the abstract, there was some amorphous statements, such as the ones in *Cutera*, for instance, or *Intuitive*, where there was a 10-K where they said, "We have really good employment relations."

That's not what's happening here, Your Honor.  What's happening here is that there are pointed, focused questions from analysts about specifically what is going to drive the momentum; and they say that the individuals that we have hired, including Mr. Anderson, are going to make us achieve our objectives.

Now, I believe that --

THE COURT:  At the time they made that representation, did they know they were going to get rid of him?

MR. JAFRI:  Well, he was -- he was terminated or, perhaps, left on his own towards the end of the class period in February, but there are --

THE COURT:  But so -- excuse me.  I'm sorry to interrupt.

So on November 21st, when they say that, they -- they don't have knowledge that -- they actually think, one presumes, at the time they said it that he's going to be a great help to the company.  They're not planning to get rid of him.  It's not a situation where they go to the marketplace and they say, "Anderson is the greatest thing since sliced bread.  He's going to bring this company to the next level," and all the while they know they're just about to can him.  There's no such thing here.

They're telling the marketplace, "We think he's great." They wouldn't probably be saying that if they knew he was about to decamp.  So where is the knowing misrepresentation to the marketplace on that November 21st call?

MR. JAFRI:  Because based on what a confidential witness says, there was already infighting, they were already overruling his plan.  And it wasn't just him.  This was sort of their way of behaving with respect to high-level executives.

So one of the confidential witnesses that we describe in

the complaint was Confidential Witness 1, who was the former chief revenue officer of the company.  He describes a very abusive atmosphere, where Mr. Calderoni's veins are popping out and overruling managers and getting angry with them.  He left months before Mr. Anderson was hired.

There is another confidential witness, Confidential Witness 4 --

**THE COURT:**  Yes.  But, Counsel, what you're not responding to the concern -- or I'm not articulating the concern correctly -- is that in order for you to have an actionable claim, you would have to be able to say that at the time they made these representations, they knew something they were keeping from the -- from the marketplace, some piece of material information.

It would be something like:  We knew we were going to fire somebody two weeks later; but because we want to keep the numbers up, we're going to say This person's going to take us, you know, to the next level.

All you're describing for me is, at most, a terrible manager, accepting all that you've said, Mr. Calderoni, who's a miserable person to work with; but at the time he's making these statements, he's not -- he's hoping, one presumes, that Anderson's going to -- going to stay and the other people are going to stay.  They leave because, according to you, they think he's a terrible manager, but he's not knowingly telling

the marketplace something that he knows at the time is not true.

**MR. JAFRI:**  Your Honor, I think just to articulate the theory properly, the issue isn't that he was terminated or fired.  The issue is, if you look at the disclosure when they disclosed, for instance, that "We're not going to be able to meet our billings growth," and the billings with the clients went from 25 percent to 44 percent -- right? -- they specifically said that the reason why this happened is because of management changes.

Then they talked about Anderson, and they said, "He's leaving for personal reasons," which is their own explanation of what happened.  That is immediately undermined by an analyst who said, "Based on my checks and my investigation, he left because there were -- there was conflict between him and the higher-level executives, including Mr. Calderoni and Mr. Morton."

Now, according to Confidential Witness 4, before this statement is made, Mr. Calderoni interfered with Mr. Anderson's efforts to improve sales operations and growth.  So we have that fact that has already happened with --

**THE COURT:**  And all that says is that he's a lousy manager.  What is it he's -- what is he saying to the marketplace that he knows is not true?

What is he saying?

He's not saying anything about -- he's not -- he -- you might have a wonderful employment claim against Mr. Calderoni because he's -- he's creating a hostile work environment and he's a terrible person -- I'm assuming this all based on what you've said in your complaint -- but what is not happening is he's not making pronouncements or omitting to make statements of material information to the marketplace that at the time he says them he knows are false.  He's not doing that.

And so the subsequent moment in time where they say management changes are causing us not to meet our targets, that's not inconsistent with the fact that earlier he didn't know that the management team was going to, in part or in whole, decamp.

MR. JAFRI:  Well, I think, the issue is not whether the statement is false; it's whether it's a misleading statement.  And --

THE COURT:  But it has to be knowingly misleading. They have to -- they have to know that, that it's misleading.

MR. JAFRI:  Your Honor, either knowingly or recklessly misleading.

THE COURT:  Or recklessly, correct.

MR. JAFRI:  Right.  And so I think the theory of our case here is that it was reckless for them to paint this positive picture, to tout the sales force, to talk about billings growth, when they were aware of facts that at least

put much of that at risk well before the statements were made.

And I just want to emphasize that this is not a case about mismanagement or about the fact that there is -- that effectively Mr. Calderoni has a bad temper and makes people run away.  That's not the issue here.

The issue here is that they specifically said that we have this sales force and we've hired these people who have a history of taking the company north of $1 billion.  And they repeatedly touted that sales force as the reason why the momentum would continue, and as the reason why billings growth would be in line with revenues.

So when you make that statement, yet you have this *modus operandi* of getting into conflicts with people, overruling them -- and it's just not a question of Mr. Anderson.  There is, for instance, Mr. Melchiorre, who also left, based on confidential witnesses, several months before any of these misleading statements were made.  And he was, I believe, known as the guru and the ultimate sales guy.  And I think similar phrases were used to describe Mr. Anderson as well, who was known as the rock star sales guy.

So this is not just a question of an isolated executive having a conflict and leaving.  This is essentially a situation where they have this operational style that creates this toxic environment.

So -- and just one thing I wanted to emphasize.

**THE COURT:**  So what should they have said?  Should they have said to the marketplace, "You should know we're in -- we have a lot of turmoil here because it's -- you know, lot of people have a very low morale.  So you, the marketing public -- or the investing public, should take into account people don't last here very long"?

I mean, what is it that they're supposed to be saying to the marketplace?  What is it that would make it honest?  They should say, "We've got a bad track record of keeping people, so, you know, you should keep that in mind"?

**MR. JAFRI:**  Your Honor, exactly.  I think that would help investors tremendously.

I mean, I'll give you one example.

**THE COURT:**  That would be quite a statement.  I'd like to see that -- a company do that; but, yeah, okay.

**MR. JAFRI:**  So I would give you an example of where it happened.  One of the incidents -- one of the cases that they rely on is *Aerohive*.  They have cited it in their opening brief, as well as in their reply brief.  I, in fact, litigated that case.  There was a very specific -- highly specific disclosure there about a disruptive turnover that had happened before, that was happening on an ongoing basis and that would continue to happen.  That is what distinguishes that case from here, where you do not have any such disclosure at all.

So, yes, I think that if you have a disruptive environment

where you have people leaving, where your policy, pursuant to what the confidential witnesses have said is hire fast and fire faster, then you either should not be making the kinds of misleading statements that have been made; and if you choose to make them, you should at least disclose the negative information that cuts against that information.

Now, with respect to *Aerohive*, another thing that the defendants say here is that that case requires you to quantify the sales force turnover. The theories in that case were a little different. It's not just an issue of quantity; it's also an issue of quality. And here we have a situation where we have very senior executives leaving the company and not being able to contribute towards the kind of momentum that the defendants touted throughout the period.

So, for instance, according to Confidential Witness 4, the head of the customer relations left, the head of analyst relations and marketing was no longer there, the head of field marketing wasn't there.

Confidential Witness 1, who basically decided to abandon millions in stock before the purported fraud began due to the toxic environment, was the chief revenue officer of the company.

I mean, I don't -- I don't think this is an issue where you can just simply say, "Well, you haven't given us evidence of what the total sales force was like, and 50 percent of it

was terminated before we made these misstatements."  It's more of a quality issue, and I think that we have pled that adequately.

**THE COURT:**  So not to be facetious about it, so you would say what they should do is, for example, "We've hired on Mr. Anderson.  We have -- he's done a great job in the past. We think he can take us to the next level.  We do note that, historically, there have been some turnover within the ranks and, therefore, you know, while we're hopeful this will work out, we have to alert you, the marketplace, that we can't guarantee that our workforce is going to remain in place," or something like that.

Do you think that's what they need to do?

**MR. JAFRI:**  I think that would go a long way towards telling the truth, Your Honor.  Yes, I do think that that would perhaps make it a different case.

And that was one of the critical reasons why Judge Koh dismissed the case in *Aerohive* because she relied heavily on that disclosure that I described to you and said, "Well, if they said this, then where's the turnover problem?"

That was, I think, the main reason why the case got dismissed.  And you will not find any similar disclosure here at all.  Here the statements are quite to the contrary.

And, Your Honor, it's just not an issue of turnover.  We also have said that there were these CWs who said the deals

were inflated, and that you had managers effectively manipulating the sales force platform and then effectively pushing deals that they knew did not have a high likelihood of being completed.

THE COURT:  That moves into the, you know, channel-stuffing type of allegation, that they're perhaps recognizing revenue before it should be recognized.

Is that really what you're claiming here?  Because I didn't see, in this complaint, something as specific as "deals are being recognized when they shouldn't be under generally accounting principles and the like."

You're not claiming that here, are you?

MR. JAFRI:  No, Your Honor.  This is not a channel-stuffing case.  So we're not saying that they stuffed the channel and, therefore, you know, for instance, effectively were counting deals that they wouldn't -- that they knew that would be coming in much, much later in the year, for instance, which is how channel-stuffing typically works.

This is not channel-stuffing.  It's about exaggeration in the pipeline and distorting forecasts, and this is a different kind of allegation.  And you have CWs over here saying that they effectively knew that many of these deals didn't either have a likelihood of closing in the quarters that they expected them to or wouldn't close, for instance, in terms of quantity.

For instance, there's one CW who said a deal over

1.3 million that was expected to close in the fourth quarter of 2020, effectively closed in the following quarter for 400,000. So -- and then you have another CW, Confidential Witness 2, who ties that and says, "I prepared forecasts that were based on this exaggeration."

So that, obviously, is another reason that contributes towards why they effectively knew but did not disclose that the billings growth rate was at risk and ultimately would not end up being as high as they told investors.

And so that's another thing.  And then another allegation based on confidential witness accounts is that -- at least there are several confidential witnesses who said that many sales representatives -- in fact, I think it's a general allegation for all sales representatives -- were -- had only met 10 to 20 percent of their quotas.

So when you take all of this in combination, that is where the billing growth rate, which was 44 percent, and then went up to 59 percent, then slides to 25 percent, and that clearly didn't happen overnight.

And, yet, they never disclosed those facts.  They continued to make misleading statements that were to the contrary.

And I think that what also matters is the fact that the statements here, to the extent that anyone, you know, concludes that they are puffery, the case law is pretty clear that if you

are making representations in response to direct, pointed analyst questions about a specific subject, then that's not picture.  The Seventh Circuit held that in *Tellabs*.  I will give you the citation.  It's 437 F.3d 588.

I believe there was a case the defendants cited and we discussed it in our opposition, I think it's *Rackable*, which also says this; that if you are specifically being questioned about something and you give a misleading response, even if it is potentially amorphous, the fact that an analyst is specifically questioning you about it or an industry participant is questioning you about it and then you respond in a misleading fashion, that's actionable.

Now, going back to my initial discussion about how all of this ties into the statements, as late as December 13th, 2019, when Mr. Calderoni appeared on Mr. Cramer's program on CNBC, he was specifically questioned.  This is well into the quarter.  So this was not something that you couldn't anticipate.

I mean, at this point, given that they are getting monthly reports about bookings and backlog, and that Mr. Calderoni is involving himself and micromanaging the process every time you have a sales representative who is below quota, given that this is the backdrop behind when he makes the statement well into the quarter, in fact more than a month -- more than a month and a half into it, he's specifically questioned by Mr. Cramer, "Well, what is the reason for the momentum?  Why have you gone

up from 46 percent to 59 percent?"

And he ends up touting how the company has this great platform and that they are going to, in fact, accelerate even further.  That's December 13th, 2019.  Within two months, he's saying, "Well, actually, our billing growth rate has gone down from 59 percent to 25 percent," and blames management changes.

So it's not based on fluctuations at the end of the quarter or missing deals or an expectation that everything just somehow closes towards the end of the quarter, which is -- which is -- which is the strawman that you will find in the papers.

If any of that was true, then why is Mr. Calderoni saying that "We missed our billings growth rate because of management changes" and then announcing that Mr. Anderson is leaving for personal reasons?

But that is not believed by the market because analysts are saying, "We ran checks and he basically left because there was a personal conflict with Calderoni."

And then we have other CWs who say it's just not Mr. Anderson, it was also Mr. Melchiorre; it was also all these other high-level executives who left because of the toxic environment.  And then there's Confidential Witness 1, who, of course, was not there during the class period but was a chief revenue officer, and corroborates that he left because of the toxic environment.

**THE COURT:** The defendants are right that none of the CWs -- and I think you've got eight of them -- none of them were there during the class period; is that right?

**MR. JAFRI:** No, Your Honor, that's incorrect. There were only a few who were not there.

**THE COURT:** Three of them were there.

**MR. JAFRI:** Many of them were there during the class period.

So Confidential Witness 4, who we discussed and who, in fact, corroborated Confidential Witness 1's statement about the toxic environment and said Mr. Morton was even worse than Mr. Calderoni, he was there from November 2019 to June 2020. That's well beyond the class period.

Then we have Confidential Witness 5, who was the regional vice president of sales, who was there from September of 2019 to April 2020.

We have Confidential Witness 6 and 7 were there for part of the class period. One of them left in November 2019, and the other left in December 2019.

Now, I mean, I think I've already mentioned several of them, and I believe there were nine. To the extent there are any confidential witnesses who were not there, it does not matter if they were not there. In quality systems there was a higher level executive who was a director and then confidential witnesses, some of whom were not there in the class period --

THE COURT:  I understand.  It doesn't mean that you're -- if you have relevant information, it can be information that would be corroborative, or whatever, that even if it wasn't, they're not there.  I agree with that.  I'm not suggesting that you can't have valuable information from a cooperating witness who might not have been there during the class period.

So I didn't mean that.  I was just inquiring.

Okay.  Let me let the Defense -- I'll give you a chance to weigh in afterwards.  So let me have the Defense address some of these points.

Who wants to speak on the Defense side?

MR. LOHNES:  I'll speak, Your Honor.  This is Mike Lohnes.  And feel free to interrupt me any time or if I'm going into information that --

THE COURT:  Oh, I will.  Oh, I will.

MR. LOHNES:  Okay.  I'm sure you will.  That's great.

No, we agree with you on kind of -- we definitely agree with you on the tentative ruling.

And what is this case about?  It's not a financial restatement case.  It's not a financial fraud case.  It's not even a case where the company missed a forecast.  In fact, the metric of that issue here, billings, was never forecasted by the company at any time prior to or during the class period.  The one forecast they did -- the company did put out was

revenue, which they undoubtedly met.

Despite this fact, you know, plaintiff has latched on primarily, as you'll see in the briefing, to Mr. Morton's statement on the November 2019, earnings call, and that statement's recited in paragraph -- page -- paragraph 53 of the complaint.  And I'm happy to read it to Your Honor, but --

**THE COURT:**  No, no.  I have it heard.

**MR. LOHNES:**  Yeah.  Suffice to say that Morton was clearly talking about annual tracking, annual performance, based on the context of that statement.  And there is no question that billings did, in fact, track with revenue for the fiscal year 2020.

For that reason, we don't even think case raises to the level of fraud by hindsight.  There's nothing in hindsight that even smells, looks, or feels like fraud here.

But even if we're going to buy into and accept plaintiff's arguments that he was talking about quarterly billings performance, the complaint still fails, Your Honor.

This statement was made three weeks into the start of the fourth quarter, and the company repeatedly disclosed that the majority -- the vast majority of its deals closed in the fourth quarter.  It's like a hockey stick.

So plaintiffs have not alleged any facts from their confidential witnesses who weren't there, or even the ones who were there, about Anaplan's billings as of November 2019.

Rather, they threw a bunch of stuff against the wall about a toxic work environment, bad managers, bad bosses, and say that that somehow is related to the ultimate billings decline that was announced, but they don't tie those two facts together.  The confidential witnesses here really are window dressing.  They do nothing to show the scienter or veracity of any of the statements that were made.

And I also --

**THE COURT:**  Well, let's assume they say -- they say, "Well, the company is throwing all its eggs in the basket of talking about how particular growth officers are going to drive success," and at the time that they say that, accepting all of the averments that the plaintiffs have made, they -- they're suggesting that they should have known that because of the dysfunctional nature of how the senior management is operating, that they -- that you can't count on that being the case; that, you know, past history indicates that there is -- there is turmoil in the executive suite here, and it's irresponsible -- you know, it's reckless for the company to go out there in the marketplace and say, "Oh, you know, we're on the road to billing acceleration because we've got this great team," knowing that it's, based on past experience, unlikely the team was going to say together.

Why is that -- why is -- you know, you're going to say that's not what the facts will show, but why isn't that enough

to advance the claim?

**MR. LOHNES:**  I think, if that's enough to advance the claim, then every publicly traded company would likely have a lawsuit on its hands based on those.

I view those as two separate categories:  Announcing Mr. Anderson's hire and the company's genuine optimism about him coming on; and then I see Mr. Morton's very vanilla observation about how billing tracked growth on an annual basis, which turned out to be case for fiscal year 2020; they tracked right along with each other.

**THE COURT:**  I guess I want to confirm something.  You were sort of talking about fraud by hindsight, and this isn't even fraud by hindsight.

And then were you saying that none of the statements -- using Mr. Morton's statement in November 21st, for example, it isn't even false?  Or "false" perhaps is the wrong word.  That it remains true to this day?

Or are you saying it's a protected, forward-looking statement that wasn't actionable?

Which is it?

**MR. LOHNES:**  No.  First and foremost, it wasn't false, Your Honor.  He was talking about annual performance.  And we've submitted the data with our papers; and if you look at annual performance, those two metrics track.

But if you buy into plaintiff's argument that he was

really talking about a quarterly, you know, performance, that argument also fails because they have not alleged any facts establishing what billings were doing in the first three weeks of the quarter.  And the confidential witnesses offer nothing along those lines.

And they also throw in this information about inflating internal reports and manipulation by, you know, middle managers' additional reports.  It just kind of defies logic why the individual defendants would have any incentive to have internal reports inflated or manipulated when those reports never see the light of day.

I'm happy to go through, you know, that there's scienter allegations if you like, Your Honor; but at the end of the day, there's just nothing tying this toxic work environment -- you know, the allegations of this toxic work environment to the billings performance.

THE COURT:  Well, why don't you just comment, because plaintiffs were emphasizing it, the whole Cramer, CNBC, December 13th, 2019, *Mad Money* interview, where plaintiff is saying, well -- in response to specific questions, not just generalized statements that are being made in the marketplace, but, you know, questions that are coming from the host, that that's where, at that late date, the relatively late date, they should have come forward with, you know, some caveats, I guess, about management changes and the like.

I think we're losing you there.

(Pause in proceedings.)

MR. LOHNES:  Can you hear me now?

THE COURT:  Yes.

MR. LOHNES:  Okay.  I'm looking for the exact quote in the *Mad Money* article or interview, but it's my recollection that it didn't make any comments or representations about the status or momentum of billings.  He was asked a question, and I think --

THE COURT:  I think the question, if I recall correctly, it was something along the lines of, "Well, you were at 59 percent billing acceleration.  How have you achieved this great result?"

Something like that.

MR. LOHNES:  Yeah, that's exactly right.  I'm just trying to put it in context for you, Your Honor.  Give me one second.

(Pause in proceedings.)

MR. LOHNES:  May I ask Paul, who's on the line, what paragraph that's in?

MR. YONG:  Yes.  Mike, it's paragraph 72 and 73 in the amended complaint.

MR. LOHNES:  Thank you.  Sorry.

MR. YONG:  No worries.

MR. LOHNES:  So, Your Honor, first of all, before even

at this date in December, there could still be no certainty of where the billings are going given the hockey stick effect and most of the deals are closed in the fourth -- towards the end of the quarters.

But if you look at the bolded language that they quote in the complaint, that what they point out as supposedly as being fraudulent, it says (as read):

> "We've got a great platform that we can offer great value in a reasonable amount of time for companies to implement Anaplan, and then to also accelerate. That's what's really driving our growth."

I do not see anything fraudulent or misrepresent- -- a misrepresentation on that statement on Mr. Cramer's *Mad Money* television show.

**THE COURT:** Okay. Let me go back to you, Mr. Jafri.

**MR. JAFRI:** Thank you, Your Honor.

I just wanted to pick up on a couple of things that Mr. Lohnes said.

Firstly, this case is not about a billing guidance or a revenue guidance. We explain in detail in our complaint that this is a software-as-a-service company. What people care about is the percentage of growth in billings. We explained in detail how venture capitalists care about that. We explained that revenue increases or improvements in total revenue can be

misleading for companies like this because they're a subscription service, and a lot of this is based on deferred revenue since they are basically accumulating money over time, but the costs are effectively a one-hit item that they take in the beginning.

We explained that analysts cared about this statement, yet they focus on things that are not part of the case. We are not focused on revenue guidance. We are not focused on whether a guidance was given for the billings figure. We are focused on concrete assertions that were made about billing momentum and growth and about how there were facts that undermined those statements and rendered them misleading. That's what the case is about.

And I think if we focus on what's actually pled, then we get to actionability. If we focus on things that the defendants effectively try and say we should be focusing on when that's not something that we've pled, then we're getting sidetracked.

And another thing, Your Honor, the fact that they have claimed that one of his statements about overall revenue growth was a reference to an annual figure, there's no substantiation for this, nor can the Court effectively assume based on -- nor can the Court effectively assume, based on documents that they've submitted, that their interpretation should get weight at the pleadings stage.

The fact of the matter is that the company knows what to describe when it is doing so.  It uses year-over-year metrics.  It uses quarterly figures.  It uses annual figures.  In this statement, there is no reference to the term "annual."  You cannot have someone come in and say, "Well, this is what we really meant for the purposes of litigation," and have a Court effectively assume the truth of that statement at the pleading stage.

The fact of the matter is that the stock price declined by 25 percent when negative news came out about the decline in billings growth.  Multiple analysts said this created headwinds.  They admitted that it was because of management changes, not because of fluctuations, not because of missed deals, not because some deals were expected to close at the end of the quarter.  That's what we need to be focusing on.

I mean, the fact of the matter is we need to hold them, at least based on -- hold them at their word as to why they said the miss happened.  They said the miss happened because of management changes, not because of any of the reasons that were mentioned in the briefs.

And analysts in the market reacted negatively to the news and, in fact, called out the company and said, "Even this excuse that they've given that Mr. Anderson left because of personal reasons is false based on our own checks."  That's what the case is about.

And, I think, based on that context when you, again, go back and look at the fact that many of these problems --

**THE COURT:**  Let me ask you:  Does it matter, your case, why he left?  I mean, does it matter?

**MR. JAFRI:**  Mr. Anderson?

**THE COURT:**  Yeah.  You're making a lot out of the fact that you think it's disingenuous that it wasn't for the old traditional "I'm leaving to spend more time with the family," which is -- you know, we hear from political figures and others.

Does it matter if that's true or not to your case?

**MR. JAFRI:**  Yes.

**THE COURT:**  Why?

**MR. JAFRI:**  Because I think -- because I think it's not just him, but there are several other high-level executives who basically left money on the table and said, "This was a toxic climate.  We weren't allowed to do what we wanted to."

With respect to Mr. Anderson specifically, there's a confidential witness who says that Mr. Calderoni tried to thwart his plans.  This was somebody who came from Palo Alto Networks and effectively is one of the best managers out there.

**THE COURT:**  Yes.  But to an investor, I would think the only significance is:  Will this person continue to be there or not?  Not why they left.  Who cares?  Who cares if they -- let's say he honestly did leave because he wanted to

spend more time with his family.  The fact of the matter is, the importance is, he's not there anymore.

So why he leaves -- this gets back to this whole long discussion you have about, as you say, the toxic work environment.  Again, I'll assume that it was, in fact, as you describe.  I don't understand why that, in and of itself, is of any consequence.

The only thing that you're -- the only significance for you is whether or not certain key employees are going to be there or not be there; not whether or not they're leaving because they want to leave for other reasons.

The reason doesn't matter, does it?

**MR. JAFRI:**  I think it does because it goes back to the fact of:  What did the defendants know before they made the misleading statements?

Mr. Calderoni knows his own operational style.  He knows he has a habit of driving away higher-level executives, micromanaging people, getting angry, engaging in abuse, with his veins popping out, as certain CWs said happened, well before the misleading statements were made.  That's why it matters.

And that's classic evidence of scienter, knowing something before you make a misleading statement yet still making it. Facts that exist before a misleading statement are made that render your misleading statements either misleading on their

own or false, that is actionable.  And I think that's why it matters, Your Honor.

Because this is something that didn't just creep up on them; right?

I mean, this whole notion that, "Well, we couldn't expect that these deals wouldn't go through," this is not about deals. They said that they missed the billing momemtum and the billing growth figures because of management changes.  That was happening well before the class period.

So going back to Confidential Witness 1, why does he matter?  Because he was the chief revenue officer who left in April 2019, many, many months before the misleading statements were made, and his experience was the same as Mr. Anderson's, the same as Mr. Melchiorre's, the same as every other high-level executive who fled this company because of that toxic climate.

And yet they said, "We have this great sales force and many of these people have taken the company north of $1 billion billings growth, Mr. Cramer.  You know, it's -- acceleration is what's going to drive growth."

Now, for instance, that statement that you focused on towards the end, what Mr. Lohnes did not mention is the word "acceleration," and the fact that they said, "Yeah, we're going to accelerate," when acceleration was not driving growth at this point because of that toxic climate.

And not just that, but also the growing threats, the lack of the sales force meeting its quotas.  It's a constellation of things.

And, yes, this is very important.  Going back to the point that I made, Your Honor, yes, we don't have hard numbers but we're not required to have hard numbers.  This idea, again, that "Oh, well, you have some of these people who said deals were blown but you don't give timing," we are not required to plead such facts.  We are only required to give fair notice of the claims.

There is a very recent case that came out against the one -- IMDb Bank [sic] involving Islamic bonds.  It was a very big fraud.  Goldman Sachs was sued.  They made the same kinds of arguments that "You have given us these vague allegations and so on, but there's nothing about timing or when someone said something to somebody, or when somebody knew some -- a specific thing."

And the Court in the Southern District of New York said that even in a securities fraud case, you are not required to plead the time, place, or manner; you are only required to give fair notice of the claims.  Yes, of course, that requires particularity.  Yes, of course, that requires a high degree of specificity, all of which are filled.  We pled the who, what, when, where, how of why the statement is misleading, and that's all that the law requires.

THE COURT:  I'm still at a bit of a loss, though, to understand what you think this entity on all of these issues should have been stated.  I mean, again, not to be facetious, but it really sounds like you're saying, in announcing who the sales team is or the growth team is, they should say, "Now, you should realize that our CEO is -- is a jerk and people don't like working for him.  And, you know, this is our team now; but, you know, from past history, just be aware, people don't -- you know, don't like him," and he has all those attributes that you've described, "and, therefore, you know, we can't be sure they're going to stay around.  As good as they are, we're not sure they're going to stay around."

That's a bit nonsensical and -- but in a way, that's what you think they would be required to do, is to say -- effectively say, "We have this great team, but we have a toxic work environment.  So that's the lay of the land."  That's what you would expect them to do, and I find that kind of bizarre.

MR. VANYO:  Your Honor, this is Bruce Vanyo.  Can I just interject something quickly?

I think plaintiff's theory on this really falls apart when you look at what they allege in the complaint.  They allege that this toxic environment, these terminations, turnover, were going on in the first quarter, the second quarter, the third quarter.  Every one of those quarters was highly successful.  It was growth after growth after growth.

So it seems to me the company was doing just fine despite the supposed toxic environment; and, yet, why in the fourth quarter did that toxic environment suddenly come -- cause the numbers to be disappointing?  Not bad, just disappointing.

THE COURT:  Okay.  Well, let me go back to you, Mr. Jafri.

MR. JAFRI:  Yes, Your Honor.

So with respect to Mr. Vanyo's speculation, things tend to catch up with you and they did, and they admitted that it was because of the management changes.

I mean, he -- again, this is a constant, like, thing where they don't want to accept what their clients have admitted to. He did not say that we missed certain deals.  He did not say there were quarterly fluctuations.  He said there -- it was because of management changes and Mr. Anderson's departure. That's why the billings growth is not where it used to be.

Now, going back to your point, Your Honor, that, well, the fact that they would make the statement about, "Yeah, we have this toxic climate and lots of turnover," and somehow that's bizarre, the issue here is not just about the sales force statements.  Let's go back and look at the statements.

On November 21st, they said that "There was ongoing strength that we see in our business."  This is not a forward-looking statement.  It's a statement about present business conditions.  They did not disclose any of the facts

that we discussed.  That's what rendered the statement misleading.  You don't have ongoing strength in your business when you have this sort of deterioration taking place.

Then with respect to the deferred patents, they said, "We will continue at the rate and pace as we guide our performance this year within the lines of the preliminary guidance we gave for the next fiscal quarter."  Again, not the disclosing the risks.  It's the issue about the statements that you are making without disclosing the risks that are undermining that.

Then, for instance, this statement --

**THE COURT:**  The risk being that their sales force will leave?

**MR. JAFRI:**  The risk being that there is serious turmoil and infighting at higher levels of management, the fact that there are blown commits, that most sales personnel are not meeting their quotas, and the fact that inflated deals are included in forecasts because of a pressure campaign that either is known or is recklessly disregarded by the management of the company.

**THE COURT:**  Okay.  I think I've got it.  I've got the arguments, and --

**MR. LOHNES:**  May I put on one last point?

**THE COURT:**  One more point, and then I'm going to move on to the next case.

**MR. LOHNES:**  No, you got it.

The quotes that opposing counsel has given you about projections, that's obviously about revenue because we weren't projecting billings.  And, again, we hit those projections and actually exceeded those revenue projections despite any toxic work environment.

That's the last point I wanted to make.  Thank you.

THE COURT:  Thank you.

I will take the matter under submission and get you an order.

MR. JAFRI:  Thank you, Your Honor.

MR. LOHNES:  Thank you, Your Honor.

MR. YONG:  Thank you, Your Honor.

MR. LOHNES:  Have a good day.

(Proceedings adjourned at 2:16 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Sunday, October 29, 2024

_____

Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court